## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ODETTE BLANCO DE FERNANDEZ )
*née* BLANCO ROSELL; EMMA RUTH )
BLANCO, in her personal capacity, and )
as Personal Representative of the ESTATE )
OF ALFREDO BLANCO ROSELL, JR; )
HEBE BLANCO MIYARES, in her )
personal capacity, and as Personal )
Representative of the ESTATE OF )
BYRON BLANCO ROSELL; SERGIO )
BLANCO DE LA TORRE, in his personal )
capacity, and as Administrator *Ad Litem* )
of the ESTATE OF ENRIQUE BLANCO )
ROSELL; EDUARDO BLANCO DE LA )
TORRE, as Administrator *Ad Litem* of the )
ESTATE OF FLORENTINO BLANCO )
ROSELL; LIANA MARIA BLANCO; )
SUSANNAH VALENTINA BLANCO; )
LYDIA BLANCO BONAFONTE; )
JACQUELINE M. DELGADO; BYRON )
BLANCO, JR.; MAGDALENA BLANCO )
MONTOTO; FLORENTINO BLANCO )
DE LA TORRE; JOSEPH E. BUSHMAN; )
CARLOS BLANCO DE LA TORRE; and )
GUILLERMO BLANCO DE LA TORRE; )
)
       Plaintiffs, )   C. A. No. 1:21-cv-01052-CFC
)
   v. )   **DEMAND FOR JURY TRIAL**
)
)
SEABOARD CORPORATION )
)
       Defendant. )

## AMENDED COMPLAINT

Odette Blanco de Fernandez *née* Blanco Rosell; Emma Ruth Blanco, in her personal

capacity, and as Personal Representative of the Estate of Alfredo Blanco Rosell, Jr; Hebe Blanco

Miyares, in her personal capacity, and as Personal Representative of the Estate of Byron Blanco

Rosell; Sergio Blanco de la Torre, in his personal capacity, and as Administrator *Ad Litem* of the Estate of Enrique Blanco Rosell; Eduardo Blanco de la Torre, as Administrator *Ad Litem* of the Estate of Florentino Blanco Rosell; Liana Maria Blanco; Susannah Valentina Blanco; Lydia Blanco Bonafonte; Jacqueline M. Delgado; Byron Blanco, Jr.; Magdalena Blanco Montoto; Florentino Blanco de la Torre; Joseph E. Bushman; Carlos Blanco de la Torre; and Guillermo Blanco de la Torre (collectively, "Plaintiffs"), by and through undersigned counsel, as and for their Amended Complaint against Defendant Seaboard Corporation ("Defendant," or "Seaboard") hereby allege:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action to recover damages and interest under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, codified at 22 U.S.C. § 6021, *et seq.* (the "Helms-Burton Act" or "Act") against Seaboard for trafficking in property that was confiscated by the Cuban Government on or after January 1, 1959, and as to which Plaintiffs own claims.

2.      The Helms-Burton Act was enacted in 1996 to preserve the "fundamental right to own and enjoy property which is enshrined in the United States Constitution" and to provide a remedy for the "wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner." 22 U.S.C. § 6081.

3.      Congress expressly found that "[s]ince Fidel Castro seized power in Cuba in 1959 … he has trampled on the fundamental rights of the Cuban people; and … through his personal despotism, he has confiscated the property of" Cuban citizens, U.S. nationals, and Cubans who have sought asylum in the United States. 22 U.S.C. § 6081. Recent events, including mass

protests, have shown that the Cuban Government—even after the death of Fidel Castro—continues to oppress and deprive its people.

4.    In explaining its enactment of the Helms Burton Act, Congress expressly found: "The Castro government threatens international peace and security by engaging in acts of armed subversion and terrorism such as the training and supplying of groups dedicated to international violence."  110 Stat. 785, 787, 104 P.L. 114.

5.    Congress further announced that it is "the foreign policy of the United States … to bring democratic institutions to Cuba through the pressure of a general economic embargo … and … to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government."  22 U.S.C. § 6081.

6.    The Cuban Government has allowed foreign companies, such as Seaboard, to benefit and profit from the use of confiscated property.  "This 'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise, to the current Cuban Government and thus *undermines the foreign policy of the United States*."  22 U.S.C. § 6081 (emphasis added).

7.    In addition, for most of the period since 1982, the U.S. Department of State has designated Cuba a State Sponsor of Terrorism.  Currently, only three other countries join Cuba on that list—North Korea, Iran, and Syria.  Most recently, the State Department explained Cuba's inclusion on the list as follows:

> For decades, the Cuban government has fed, housed, and provided medical care for murderers, bombmakers, and hijackers, while many Cubans go hungry, homeless, and without basic medicine. Members of the National Liberation Army (ELN), a U.S.-designated Foreign Terrorist Organization, traveled to Havana to conduct peace talks with the Colombian government in 2017. Citing peace negotiation protocols, Cuba has refused Colombia's requests to extradite ten ELN leaders living in Havana after the group claimed responsibility for the January 2019 bombing of a Bogota police academy that killed 22 people and injured more than 87 others.

Cuba also harbors several U.S. fugitives from justice wanted on or convicted of charges of political violence, many of whom have resided in Cuba for decades.  For example, the Cuban regime has refused to return Joanne Chesimard, on the FBI's Most Wanted Terrorists List for executing New Jersey State Trooper Werner Foerster in 1973; Ishmael LaBeet, convicted of killing eight people in the U.S. Virgin Islands in 1972; Charles Lee Hill, charged with killing New Mexico state policeman Robert Rosenbloom in 1971; and others.

Cuba returns to the SST list following its broken commitment to stop supporting terrorism as a condition of its removal by the previous administration in 2015.  On May 13, 2020, the State Department notified Congress that it had certified Cuba under Section 40A(a) of the Arms Export Control Act as "not cooperating fully" with U.S. counterterrorism efforts in 2019.

In addition to the support for international terrorism …, the Cuban regime engages in a range of malign behavior across the region.  The Cuban intelligence and security apparatus has infiltrated Venezuela's security and military forces, assisting Nicholas Maduro to maintain his stranglehold over his people while allowing terrorist organizations to operate.  The Cuban government's support for FARC dissidents and the ELN continues beyond Cuba's borders as well, and the regime's support of Maduro has created a permissive environment for international terrorists to live and thrive within Venezuela.

U.S. Department of State Press Statement (Jan. 11, 2021).

8.     Recently, the Cuban Studies Institute reported that "Iran, Cuba, and Venezuela have developed a close and cooperative relationship against the U.S. and in support of terrorist groups and states."[1]  The report elaborates on Cuba's ties to terrorism:

- In 1996, Cuba shot down two unarmed civilian American aircraft over international waters in the Florida Straits; that incident immediately precipitated passage of the Helm's Burton Act.  There are outstanding U.S. indictments against Cuban Air Force pilots and General Rubén Martínez Puente, the head of the Cuban Air Force, in connection with that act of terrorism, which killed four men, three of them American citizens.  Fidel and Raul Castro personally accepted responsibility for ordering the downing.

---

[1] Cuban Studies Institute, "Cuba's Support for Terrorism," https://cubanstudiesinstitute.us/principal/cubas-support-for-terrorism (last visited August 12, 2021).

- Cuban military officers are acting as liaison between Venezuelan military and the narco-guerrillas of the Colombian FARC. Cuban General Leonardo Ramon Andollo, Chief of Operations of the Cuban MINFAR (Ministry of the Armed Forces), has visited Venezuela several times and acted as a go between the Cuban and Venezuelan military involved in drug trafficking.

- The FBI estimates that Cuba has provided safe harbor to dozens of fugitives from U.S. justice who live on the island under the protection of the Cuban regime. Some of these fugitives are charged with or have been convicted of murder, kidnapping, and hijacking, and they include notorious killers of police officers in New Jersey and New Mexico, most prominent among them Joanne Chesimard (Assata Shakur), placed by the FBI in 2013 on the "Most Wanted Terrorist List." The FBI is offering millions of dollars for information leading to her apprehension.

- Other terrorist fugitives of the U.S. living in Cuba include Ishmael LaBeet, one of the five men convicted of the infamous Fountain Valley Massacre, a racially tinged 1972-armed robbery in the Virgin Islands that turned into mass murder, with eight dead. Guillermo Morales, the master bomb-maker of the Puerto Rican separatist group FALN (Fuerzas Armadas de Liberación Nacional), which set off 140 or so explosions around the United States during the 1970s and 1980s, killing at least six people. Victor Gerena, an armed robber working for another Puerto Rican separatist group, who is believed to have taken the proceeds of a $7 million heist to Cuba with him. Charles Hill who in 1971 hijacked a civilian plane carrying 49 passengers and fled to Cuba. Hill is also wanted for the 1971 murder of New Mexico State Police officer Robert Rosenbloom. Others include William Lee Brent, William Potts, and Ronald LaBeet, all wanted in the U.S.

- Current and former Spanish members of Basque Fatherland and Liberty (ETA), a Basque terrorist organization continue to reside in Cuba. While some of these terrorists are on the island as part of an accord between the Cuban and Spanish governments, others are hiding in Cuba, fugitives of Spanish justice. ETA terrorist, Jose Angel Urtiaga Martinez, has lived in Cuba since the 1980s and is wanted by Spanish Justice. In addition, there are about a dozen other ETA members living in Cuba.

- Former Cuban intelligence official, Uberto Mario, has described how the Cuban regime trained Venezuelan "Tupamaros," pro-Maduro groups who violently attack Venezuelan students.

- Managed by Cubans and Venezuelans sympathetic to Cuba, Venezuela's immigration system, "Misión Identidad," facilitates the entry of Cuban agents into Venezuela. Cubans also control SIME (Servicio de Identificacion, Migracion y Extranjeria, Caracas) which facilitates the travel of drug organizations, Colombian guerrillas, and Islamist terrorists. Cuba

also has on the island duplicate Venezuelan forms and stamps to issue passports and identifications to these groups.

- In 2013 "Prensa Islamica" published an article on Cuba-Iran growing relationship. The article explains that Cuba has shared with Iran its "vast knowledge on intelligence" and has discussed cooperation "on electromagnetic weapons capable of sabotaging enemy communications."

- In January 2019, Colombia's President asked Cuba to extradite several leaders of Colombian terrorist group Ejército de Liberación Nacional (ELN). Yet Cuba refuses. Living in the island are a) Nicolas Rodríguez, aka Gabino; b) Israel Ramírez Pineda aka Pablo Beltrán; c) Victor Orlando Cubides, aka Aureliano Carbonell.  There are also three female members of the ELN in Cuba: Consuelo Tapias, Isabel Torres, and Luz Amanda Pallares, aka Silvana Guerrero.

- Other leaders of the Colombian terrorist group, Fuerzas Armadas Revolucionarias de Colombia, FARC have used Cubas as temporary safe heaven.  They include Ivan Marquez and Rodrigo Londoño Echeverry, aka Timochenko.

- The electro-magnetic cyber-attacks against U.S. and Canadian diplomats in Havana that harmed a number of them, is still an unresolved issue.

9.     The Cuban Studies Institute report paid particular attention to Cuba's ties to Hezbollah, which the U.S. State Department has designated a Foreign Terrorist Organization.  The report states that:

- Cuba directly and through Venezuela continues to provide intelligence to Hamas and Hezbollah.

- Hezbollah, on orders from Hasan Nasrallah, set up an operational base in Cuba.

- Working in coordination with the Cuban government, Venezuela is promoting Hezbollah and Iranian targets in South America and against the U.S.  They fundraise for Hezbollah, facilitate travel for Hezbollah activists to Venezuela, and through Venezuela to other countries.  This is all part of the strategic alliance between Venezuela, Cuba, and Iran.

- "Hezbollah in Cuba," the Hamas-funded Turkish "charity" known as IHH continues to operate in Havana.  IHH is a member of the "Union of Good," an umbrella organization that financially supports Hamas.

6

10.     Seaboard has displayed a willingness to do business with individuals and entities associated with terrorism, including those with close ties to Hezbollah.  In or around 2016, the U.S. Department of Justice (the "DOJ") investigated Seaboard's business relationship with firms linked to Kassim Tajideen, a Lebanese tycoon and convicted Hezbollah financier.[2]  The DOJ was reportedly looking into whether Seaboard tried to obscure its sales of wheat flour in Africa to companies linked to Tajideen and whether it continued to do business with the Tajideen family after some of its members were blacklisted as terrorists.[3]

11.     Seaboard also pursued a separate venture with a Lebanese businessman working in the West African nation of The Gambia who has been associated with Hezbollah: Mohammad Ibrahim Bazzi.  In 2013, Seaboard opened the Gambia Milling Corporation as a joint venture in which Bazzi's company, Premier Investment Group, had a 50% stake.[4]  Five years later, in 2018 Bazzi was named to the U.S. terror list as a Hezbollah financier.  Seaboard was still in business with him as of 2019, according to a Gambian governmental inquiry known as the Janneh Commission.[5]  In 2019, the Janneh Commission issued a report saying that the lease for the land occupied by the Gambia Milling Corporation—part of the Naval Yard in Banjul—was issued

---

[2] https://www.wsj.com/articles/terror-finance-abroad-touches-thanksgiving-at-home-1479747572 (last visited August 12, 2021).

[3]   https://www.wsj.com/articles/u-s-indicts-alleged-terror-financier-1490385734   (last   visited August 12, 2021).

[4] https://www.seaboardoverseas.com/gambia-milling-corporation/ (last visited August 12, 2021). Janneh Commission Report Volume 9: Individual Responsibility for Civil and Criminal Wrongs, available at:
https://www.moj.gm/downloads (last visited August 12, 2021).

[5] Janneh Commission Report Volume 9: Individual Responsibility for Civil and Criminal Wrongs, available at:
https://www.moj.gm/downloads (last visited August 12, 2021).
https://home.treasury.gov/news/press-releases/sm0388 (last visited August 12, 2021).

illegally and is void.[6]   The report said that Bazzi, on his own and also through the Office of the President, had lobbied the Gambia Ports Authority to allow construction of a flour mill in the Navy Yard since at least 2010.   The Janneh Commission reported that the Gambia Ports Authority had not been paid the $360,000 owed for the lease of the land as of 2019 and that, when Seaboard was alerted to the issue, Seaboard claimed it had been unaware of the debt.   Seaboard still lists Gambia Milling Corporation as one of its subsidiaries in its most recent annual report.[7]

12.     The screenshot below was captured from Seaboard's website on August 11, 2021. On information and belief, the man shown in the photograph adjusting his sunglasses is Mohammad Ibrahim Bazzi.





---

[6] Janneh Commission Report Volume 9: Individual Responsibility for Civil and Criminal Wrongs, available at:
https://www.moj.gm/downloads (last visited August 12, 2021).
[7] Seaboard 2020 10-K, available at https://www.seaboardcorp.com/investors/ (last visited August 12, 2021).

13.     There were ample warnings of Bazzi's ties to terrorism and corruption well before Seaboard opened the Gambia mill with him in 2013.  Since the early 2000s, Bazzi was a henchman of former Gambian President Yahya Jammeh and arranged deals with state-owned firms that allowed Jammeh to siphon as much as $1 billion from his country.[8]  Media reports prior to 2013 exposed Bazzi's elevated status in The Gambia and his ties to the president.[9]  Bazzi also helped found Prime Bank, which was identified in a 2011 press release by the U.S. government as a subsidiary of Lebanese Canadian Bank, a Hezbollah money-laundering operation that was on the terror list.[10]  Bazzi has been accused—in a 2011 Gambian investigative report and in a 2020 U.S. lawsuit—of playing a role in a scheme by Gambian officials to buy weapons from Iran and sell them to Hezbollah.[11]  As part of that arrangement, Bazzi is said to have used Prime Bank to facilitate a weapons shipment from Iran that was partially allocated to Gambian officials so they

---

[8] https://www.occrp.org/en/greatgambiaheist/the-inner-circle-that-helped-jammeh-steal-a-billion-dollars (last visited August 12, 2021).

[9]

https://web.archive.org/web/20110301103055/http://freedomnewspaper.com/Homepage/tabid/36/mid/367/newsid367/5960/Breaking-News-Gambia--DID-JAMMEH-SELLS-IRANIAN-ARMS-TO-HEZBOLLAH-/Default.aspx
http://africa.gm/africa/gambia/banjul/article/2008/7/14/dubai-investors-meet-jammeh (last visited August 12, 2021).
https://thepoint.gm/africa/gambia/article/us47-million-investment-project-to-commence-in-the-gambia

[10] https://www.treasury.gov/press-center/press-releases/pages/tg1057.aspx (last visited August 12, 2021).
https://web.archive.org/web/20110301103055/http://freedomnewspaper.com/Homepage/tabid/36/mid/367/newsid367/5960/Breaking-News-Gambia--DID-JAMMEH-SELLS-IRANIAN-ARMS-TO-HEZBOLLAH-/Default.aspx (last visited August 12, 2021).

[11]

https://web.archive.org/web/20110301103055/http://freedomnewspaper.com/Homepage/tabid/36/mid/367/newsid367/5960/Breaking-News-Gambia--DID-JAMMEH-SELLS-IRANIAN-ARMS-TO-HEZBOLLAH-/Default.aspx
Bartlett v. Société Générale de Banque au Liban, U.S. District Court for the Eastern District of New York, 19-cv-7.

could sell arms to rebel fighters in the Casamance region of Senegal.  The shipment was seized aboard a CMA CGM ship in Nigeria in 2010.

14.     On May 17, 2021, the U.S. State Department advertised a notice offering a reward of up to $10 million for information on Bazzi's financial networks or activities.[12]  The notice described Bazzi as a "key financier" for Hezbollah, who provided millions of dollars of support for the terrorist group through his business ventures in Europe, Africa and the Middle East.

15.     Consistent with this pattern of doing business with individuals and entities associated with terrorists, and as detailed below, Seaboard, through its subsidiaries, has trafficked in Plaintiffs' wrongfully confiscated property, thereby providing support for the Cuban Government, which has been designated by the U.S. State Department as a State Sponsor of Terrorism.  Seaboard's conduct is in direct contravention of U.S. foreign policy.

16.     "To deter trafficking in wrongfully confiscated property," the Helms Burton Act provides U.S. nationals, like the Plaintiffs, "a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081.

## PARTIES AND RELEVANT NON-PARTIES

17.     Plaintiffs incorporate by reference all of the foregoing paragraphs as if fully set forth herein.

### I.     Plaintiffs

18.     Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She acquired ownership of her claim to the

---

[12] https://twitter.com/RFJ_USA/status/1394291983393361921 (last visited August 12, 2021).

Confiscated Property before March 12, 1996, which claim she still owns.  She became a naturalized U.S. citizen on September 8, 1971.  She resides in Miami-Dade County, Florida.

19.     Alfredo Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Emma Ruth Blanco, in her capacity as Personal Representative of Alfredo Blanco Rosell's estate. The Circuit Court for Miami-Dade County, Florida, Probate Division, has opened Alfredo Blanco Rosell's estate, appointed Emma Ruth Blanco as Personal Representative, and issued Letters of Administration for the purpose of Emma Ruth Blanco pursuing Alfredo Blanco Rosell's Helms Burton Act claim.  *In re Estate of Alfredo Blanco, deceased*, Case No. 2020-005105-CP-02, Section PMH03 (J. Soto).  Alfredo Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on August 26, 1970.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.   Prior to his death on December 10, 2006, he resided in Miami-Dade County, Florida.

20.     Byron Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Hebe Blanco Miyares, in her capacity as Personal Representative of Byron Blanco Rosell's estate. The Circuit Court for Miami-Dade County, Florida, Probate Division, has opened Byron Blanco Rosell's estate, appointed Hebe Blanco Miyares as Personal Representative, and issued Letters of Administration for the purpose of Hebe Blanco Miyares pursuing Byron Blanco Rosell's Helms Burton Act claim.  *In re Estate of Byron Blanco, deceased*, Case No. 2001-002462-CP-02, Section PMH03 (J. Soto).  Byron Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1972.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.   Prior to his death on February 25, 2001, he resided in Miami-Dade County, Florida.

21.     Enrique Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Sergio Blanco de la Torre ("Sergio Blanco"), in his capacity as Administrator *Ad Litem* of Enrique Blanco Rosell's estate.  The Circuit Court for Miami-Dade County, Florida, Probate Division, has opened Enrique Blanco Rosell's estate and appointed Sergio Blanco as Administrator *Ad Litem* for the purpose of Sergio Blanco pursuing Enrique Blanco Rosell's Helms Burton Act claim.  *In re Estate of Enrique Blanco, deceased*, Case No. 2021-000187-CP-02, Section PMH03 (J. Soto).  Enrique Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on September 23, 1970.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.  Prior to his death on November 27, 2014, his last known place of residence was San Juan, Puerto Rico.

22.     Florentino Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Eduardo Blanco de la Torre, in his capacity as Administrator *Ad Litem* of Florentino Blanco Rosell's estate.  The Circuit Court for Miami-Dade County, Florida, Probate Division, has opened Florentino Blanco Rosell's estate and appointed Eduardo Blanco de la Torre as Administrator *Ad Litem* for the purpose of pursing Florentino Blanco Rosell's  Helms Burton Act claim.  *In re Estate of Florentino Blanco, deceased*, Case No. 2021-000131-CP-02, Section PMH03 (J. Soto).  Florentino Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1975.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.   Prior to his death on March 18, 2005, his last known place of residence was Baldrich, Puerto Rico.

23.     Plaintiff Emma Ruth Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco

Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on January 4, 1973. She resides in Miami-Dade County, Florida.

24.     Plaintiff Liana Maria Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Alfredo Blanco Rosell's daughter. To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. Upon knowledge, information, and belief, she became a naturalized U.S. citizen prior to March 12, 1996. She resides in Miami-Dade County, Florida.

25.     Plaintiff Susannah Valentina Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Alfredo Blanco Rosell's granddaughter. To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996. She resides in Miami-Dade County, Florida.

26.     Plaintiff Hebe Blanco Miyares is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Byron Blanco Rosell's daughter. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on September 23, 1970. She resides in Miami-Dade County, Florida.

27.     Plaintiff Lydia Blanco Bonafonte is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Byron Blanco Rosell's daughter. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on November 17, 1971. She resides in Miami-Dade County, Florida.

28.     Plaintiff Jacqueline M. Delgado is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on February 18, 1970.  She resides in Miami-Dade County, Florida.

29.     Plaintiff Byron Blanco, Jr. is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Byron Blanco Rosell's son.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, Byron Blanco, Jr. inherited and owns a portion of that claim.  He became a naturalized U.S. citizen before March 12, 1996.  He resides in Orange County, California.

30.     Plaintiff Magdalena Blanco Montoto is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Florentino Blanco Rosell's daughter.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on June 21, 1977.   She resides in Miami-Dade County, Florida.

31.     Plaintiff Sergio Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son and Enrique Blanco Rosell's nephew.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns a portion of that claim.  In addition, to the extent Enrique Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns all of that claim.  He became a naturalized U.S. citizen on January 25, 1983.  He resides in Guaynabo, Puerto Rico.

32.     Plaintiff Florentino Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that

14

Florentino Blanco Rosell's claim does not remain with his Estate, Florentino Blanco de la Torre inherited and owns a portion of that claim. He became a naturalized U.S. citizen on February 1, 1978. He resides in Guaynabo, Puerto Rico.

33. Plaintiff Joseph E. Bushman is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He is the surviving husband of Florentino Blanco Rosell's daughter, Maria Elena Blanco. To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Joseph E. Bushman inherited and owns a portion of that claim. He was born a U.S. citizen on March 14, 1947 and has remained a U.S. citizen his entire life. He resides in Sumter County, Florida.

34. Plaintiff Carlos Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He is Florentino Blanco Rosell's son. To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Carlos Blanco de la Torre inherited and owns a portion of that claim. He became a naturalized U.S. citizen on February 26, 1985. He resides in Guaynabo, Puerto Rico.

35. Plaintiff Guillermo Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He is Florentino Blanco Rosell's son. To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Guillermo Blanco de la Torre inherited and owns a portion of that claim. He became a naturalized U.S. citizen on August 3, 1982. He resides in San Juan, Puerto Rico.

## II.    Defendant Seaboard Corporation

36. Defendant Seaboard is a publicly-traded company incorporated in Delaware, with its headquarters located at 9000 W. 677th Street, Merriam, Kansas 66202. Seaboard and its wholly-owned subsidiaries comprise, control, and benefit from a diverse group of integrated

companies with a broad global presence that operate several specialized business segments including Marine, Pork, Turkey, Sugar and Alcohol, Power, and Agricultural Commodity Trading Segments.

37.     For instance, Seaboard's marine segment, operated through non-parties Seaboard Marine, Seaboard Atlantic and various foreign affiliated companies and third-party agents, provides cargo shipping services in the U.S. and 26 countries in the Caribbean (including Cuba) and Central and South America.  The primary operations of Seaboard's marine segment are located at PortMiami in Florida and include a marine terminal and an off-port warehouse for cargo consolidation and temporary storage.

38.     Defendant Seaboard's marine segment also makes scheduled vessel calls in Brooklyn, Houston, New Orleans, Philadelphia, Savannah, and various ports in the Caribbean (including, as stated herein, the Port of Mariel, Cuba) and Central and South America.

39.     Defendant Seaboard's marine segment uses a network of offices and agents to sell freight services.  Defendant Seaboard's capabilities allow transport by truck or rail of import and export cargo to and from various U.S. and foreign ports.

40.     The fleet of Seaboard's marine segment consists of approximately 21 chartered and three owned vessels, (including the Trafficking Vessels the SEABOARD ATLANTIC and the SEABOARD PATRIOT) as well as dry, refrigerated and specialized containers.

**III.     Relevant Non-Parties**

41.     Non-Party Seaboard Marine is a wholly-owned subsidiary of Defendant Seaboard and is a foreign corporation registered to do business in Florida with its principal place of business at 8001 N.W. 79th Ave., Miami, Florida 33166.

42.     Non-party Seaboard Marine is an ocean transportation company that operates vessel service between the United States and the Caribbean Basin, including at least twenty-nine direct trafficking voyages from the Port of New Orleans to the Port of Mariel, Cuba.  Seaboard Marine also operates vessels that call on ports in Central and South America.

43.     Non-Party Seaboard Atlantic is a subsidiary of Defendant Seaboard and is a foreign corporation.

44.     In 2020, Seaboard's marine segment which includes non-parties Seaboard Marine and Seaboard Atlantic, generated approximately $1 billion in revenue for Seaboard, approximately 20 percent of Seaboard's $7 billion 2020 revenue.  *See* Seaboard Corporation, United States Securities and Exchange Commission Form 10-K, Year Ended December 31, 2020 at p. 21.[13]

45.     Non-Party Terminal de Contenedores del Mariel ("TCM" or "Container Terminal") is a 100% Cuban state-owned entity.

46.     Non-Party Almacenes Universales S.A. (also known as "AUSA") is a 100% Cuban state-owned entity that is a comprehensive logistics operator that, *inter alia,* runs the container storage yard in the ZEDM.  AUSA is a subsidiary of Grupo de Administración Empresarial SA (or GAESA), an umbrella group controlled by the Cuban military.  On November 9, 2017, the U.S. State Department listed GAESA, AUSA, and the TCM as Restricted Entities and Subentities Associated with Cuba.  *See* The State Department's List of Entities and Subentities Associated with Cuba (Cuba Restricted List), 82 Fed. Reg. 52089 (Nov. 9, 2017).

47.     In December 2020, the U.S. Treasury Department added GAESA to its "Specially Designated Nationals and Blocked Persons" list, barring American individuals and companies

---

[13] https://www.sec.gov/ix?doc=/Archives/edgar/data/88121/000008812121000013/seb-20201231x10k.htm#item1 (last visited August 12, 2021).

from doing business with the company.  *See* Notice of OFAC Sanctions Action, 85 Fed. Reg. 84468 (Dec. 28, 2020).

48.    TCM and AUSA's container storage yard is physically located in the Port of Mariel. As described more fully herein (*see infra* ¶¶ 107-111), the ZEDM is a special economic zone created by Cuban statute.  TCM and AUSA are physically located in the Port of Mariel, which is within and part of the ZEDM.  TCM, AUSA and ZEDM are all agencies or instrumentalities of the Republic of Cuba as defined in § 28 U.S.C. 1603(b).

49.    TCM, AUSA and the ZEDM, while aware that the Confiscated Property had been confiscated from the Blanco Rosell family, knowingly and intentionally traffic in the Confiscated Property because they each individually and collectively, "transfer[], distribute[], dispense[], broker[], manage[] … lease[], receive[], possess[], obtain[] control of, manage[], use[], or otherwise acquire[] or hold[] an interest in" the Confiscated Property. See 22 U.S.C. § 6023(13)(A)(i). In plain terms, the TCM, AUSA and/or the ZEDM manage the land, concessionaires, and users of the ZEDM and contract with companies, including Seaboard Marine, that do business in the ZEDM and with the TCM and AUSA–for example by offloading and/or loading containers from Seaboard ships at the TCM and parking/storing them at the container storage yard operated by AUSA.

50.    TCM, AUSA and the ZEDM also engage in commercially beneficial transactions and commercial activities in which they use and benefit from the land that was confiscated from the Blanco Rosell Siblings that underlies the ZEDM and from the 70-year Concession rights to execute, maintain, and exploit the docks, wharves, warehouses, and storage areas in the Port of Mariel which is within the Bay of Mariel.

## JURISDICTION AND VENUE

51.     Plaintiffs incorporate by reference all of the foregoing paragraphs as if fully set forth herein.

52.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

53.      The amount in controversy in this action exceeds $50,000, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b).

54.     Defendant Seaboard is subject to the personal jurisdiction of this Court because it is incorporated in Delaware within this judicial district.

55.     Defendant Seaboard is subject to the personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and 10 *Del. C.* § 3111 and 8 *Del. C.* § 321.

56.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Seaboard resides in this District.

## THE HELMS-BURTON ACT

**I.     Background**

57.     Plaintiffs incorporate by reference all of the foregoing paragraphs as if fully set forth herein.

58.     In 1996, the U.S. Congress passed the Helms-Burton Act, and President Clinton signed the Act into law on March 12, 1996.  The Act had several goals, including to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime," 22 U.S.C. § 6022(6).  Further, Congress determined that "'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and

productive investment and expertise to the … Cuban Government and thus undermines the foreign policy of the United States," which foreign policy includes "protect[ing] claims of United States nationals who had property wrongfully confiscated by the Cuban Government."  22 U.S.C. § 6081(6).

59.    Congress found that international law "lacks fully effective remedies" for the "unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property."  22 U.S.C. § 6081(8).

60.    Congress thus decided that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits — from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11).  The result was Title III of the Helms-Burton Act, "Protection of Property Rights of United States Nationals," which imposes liability on persons trafficking in property confiscated from a U.S. national (including property confiscated from a person who became a U.S. national before March 12, 1996) by the Cuban Government on or after January 1, 1959, and which authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

61.    The Helms-Burton Act authorizes the President (or his delegate, the Secretary of State) to suspend for periods of up to six months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b).  Although Title III's creation of liability as to those engaged in trafficking has remained in force since August 1996, the ability of any potential plaintiff to bring a private right of action for Title III violations had been suspended by several Presidents until May 2019, when President Donald Trump allowed the suspension of Title III's private right of action to lapse, thereby allowing such actions to proceed.

62.     Although, on July 16, 1996, President Clinton suspended the private right of action under Title III for six months, the August 1, 1996 effective date was never suspended.  Title III of the Act therefore came into effect on August 1, 1996.  Starting on that date, traffickers in confiscated property were liable to U.S. nationals with claims to that property but could not be sued while the private right of action remained suspended.

63.     President Clinton and subsequent administrations renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President or Secretary of State.  There was never any guarantee that additional suspensions of the private right of action would be granted indefinitely into the future, and the operative provisions of the Act have remained in effect continuously since 1996.

64.     It should have come as no surprise to traffickers that President Trump would allow the suspension of Title III's private right of action to lapse.  As early as November 2018, then White House National Security Advisor John Bolton stated that the Trump Administration planned to give the continuing suspension of Title III "very serious review."  In January 2019, then Secretary of State Michael Pompeo announced that the Trump Administration was reviewing whether further suspensions of Title III were justifiable or necessary.

65.     On April 17, 2019, Secretary of State Pompeo announced that the Trump Administration would no longer suspend the right to bring an action under Title III, effective May 2, 2019.  On May 2, 2019, the last suspension expired, activating the right to bring an action under Title III.

## II.     The Helms-Burton Act's Private Right of Action

66.     Title III of the Helms-Burton Act, which took effect in August 1996, imposes liability against persons who "traffic" in property confiscated by the Cuban Government on or

after January 1, 1959, the claims to which are owned by persons who became U.S. nationals after the confiscation of their property and before March 12, 1996. Specifically, the Act provides:

> (1) Liability for trafficking. — (A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages...

22 U.S.C. § 6082(a)(1).

67. The Act defines "person" as "any person or entity, including any agency or instrumentality of a foreign state." 22 U.S.C. § 6023(11).

68. The Act defines "United States national" to include "any United States citizen or any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States." 22 U.S.C. § 6023(15).

69. The Act adopts the definition of "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b), *see* 22 U.S.C. § 6023(1) ("Agency or Instrumentality of a Foreign State. — The term 'agency or instrumentality of a foreign state' has the meaning given that term in section 1603(b) of title 28, United States Code.").

70. A person "traffics" in confiscated property if that person "knowingly and intentionally":

(i)     sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii)    engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii)   causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as

described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

71.     The Act defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12).

72.     The Act defines "confiscated" in relevant part as:

> [T]he nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959 —

> (i)     without the property having been returned or adequate and effective compensation provided; or

> (ii)    without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

22 U.S.C. § 6023(4)(A).

73.     The term "knowingly" under the Act means "with knowledge or having reason to know." 22 U.S.C. § 6023(9).

74.     The Helms-Burton Act adopts the definition of "commercial activity" under 28 U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

75.     Under the Act:

(A)  The term "Cuban Government" includes the government of any political subdivision of Cuba, and any agency or instrumentality of the Government of Cuba.

(B)  For purposes of subparagraph (A), the term "agency or instrumentality of the Government of Cuba" means an agency or instrumentality of a foreign state as defined in section 1603(b) of title 28, United States Code, with each reference in such section to "a foreign State" deemed to be a reference to "Cuba."

22 U.S.C. § 6023(5).

76.     Since August 1, 1996, when Title III of the Helms-Burton Act went into effect, it has been clear that companies doing business with Cuba or in Cuba incurred potential liability under the Helms-Burton Act if they knowingly and intentionally traffic in confiscated property. Companies doing business in or with Cuba have therefore been on notice since August 1, 1996, that they would face potential liability under the Helms-Burton Act for trafficking in confiscated property.

### III.     Remedies Under the Helms-Burton Act's Private Right of Action

77.     A person who "traffics" in a U.S. national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i)     the amount which is the greater of —
                        …
(II) the amount determined [by a court-appointed special master], plus interest; or

(III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A)(i).

78.     Pre-filing interest under the Act accrues from "the date of confiscation of the property involved to the date on which the action is brought."  22 U.S.C. § 6082(a)(1)(B).  Interest

is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System" for the calendar week preceding the date of confiscation and compounded annually.  28 U.S.C. § 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

79.     A person who "traffics" in a U.S. national's confiscated property under the Act is also liable for plaintiffs' court costs and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(1)(A)(ii).

80.     The Act provides for "Increased Liability"

… If the claimant in an action under this subsection… provides, after the end of the 3-month period described in paragraph (1) notice to —

(i)     a person against whom the action is to be initiated, or

(ii)    a person who is to be joined as a defendant in the action,

at least 30 days before initiating the action or joining such person as a defendant, as the case may be, and that person, after the end of the 30-day period beginning on the date the notice is provided, traffics in the confiscated property that is the subject of the action, then that person shall be liable to that claimant for damages computed in accordance with subparagraph (C).

*See* 22 U.S.C. §§ 6082(a)(3)(B) and 22 U.S.C. 6082(a)(3)(C)(ii) (allowing damages "3 times the amount determined applicable under paragraph (1)(A)(i)").

## FACTUAL ALLEGATIONS

81.     Plaintiffs incorporate by reference all of the foregoing paragraphs as if fully set forth herein.

### I.     The Confiscated Property

82.     Plaintiffs are U.S. nationals and/or representatives of the Estates of U.S. nationals as defined by 22 U.S.C. § 6023(15)(A) who own claims to the Confiscated Property, which

includes a 70-year Concession to develop docks, warehouses and port facilities on Mariel Bay and land holdings.

### A.    Maritima Mariel SA and the 70-Year Concession

83.    Maritima Mariel SA ("Maritima Mariel") was a Cuban corporation set up in 1954 and owned in equal parts by the Blanco Rosell Siblings, who are among the Plaintiffs in this case: Odette Blanco Rosell; Alfredo Blanco Rosell, Jr as represented by Plaintiff Emma Ruth Blanco, in her capacity as Personal Representative of Alfredo Blanco Rosell's estate; Byron Blanco Rosell as represented by Plaintiff Hebe Blanco Miyares in her capacity as Personal Representative of Byron Blanco Rosell's estate; Enrique Blanco Rosell as represented by Plaintiff Sergio Blanco, in his capacity as Administrator *Ad Litem* of Enrique Blanco Rosell's estate; and Florentino Blanco Rosell as represented by  Plaintiff Eduardo Blanco de la Torre, in his capacity as Administrator *Ad Litem* of Florentino Blanco Rosell's estate.

84.    On August 15, 1955, the Cuban Government granted to Maritima Mariel a 70-year Concession:

> "Maritima Mariel, SA" is hereby granted the concession to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel Bay, province of Pinar del Rio Province, and the construction of new buildings and works, without prejudice to the rights acquired by third persons or entities under previous concessions still in force, for the purposes stated in this paragraph.

Decree 2367 published in the Cuban Official Gazette dated August 15, 1955 at 13864 (English translation).   When the 70-Year Concession was granted to Maritima Mariel, there were no previous concessions in force for the purposes stated in the foregoing quoted paragraph.

85.    The 70-Year Concession also authorized Maritima Mariel to exercise a series of exceptional rights in the Bay of Mariel, including:

> a)  The occupation and use, either temporary or permanent, of the lands and waters in the public domain or under private ownership and those of the State,

province, or municipality, whenever they are essential for the execution and exploitation of the aforementioned projects and works.

b) The right of mandatory expropriation, in accordance with Decree No. 595 of May 22, 1907 or any other later provision regarding ownership, possession, or use of any real estate or private property rights for land that must be occupied for the work, uses, and services mentioned in Section One, a procedure that may also be used with regard to any rights granted by the State, province, or municipality with regard to the maritime-land zone or public domain land or property of those entities of the Nation.

c) The right to impose, on privately owned property, any class of easement for the construction of any type of roads, traffic, access, movement, and parking of vehicles, the establishment of power lines (either overhead or underground), pipes and ducts for water, gas, ventilation, or drainage and, in general, for anything that is inherent or deemed to be necessary for the purposes of carrying out, maintaining, and exploiting the works that the aforementioned paragraph one deals with, also with the power to attend those cases of forced expropriation, as provided for in the preceding subparagraph.

d) The right to evict any tenants, sharecropper, squatter, or occupant of any other description from any property or facilities that must be occupied, either temporarily or permanently, for the projects referred to repeatedly in Section One, making a payment as compensation to the parties evicted equal to the amount of one year of rent paid in each case.

e) The right to carry out the aforementioned acts by means of applying the provisions contained in Law-Decree No. 1015 of August 7, 1953 and No. 1998 of January 27, 1955, whereby the National Finance Agency of Cuba will provide the financing of those projects.

*Id.* at 13865-13866 (English translation).

86.     These exceptional rights granted in the 70-year Concession gave Maritima Mariel and the Blanco Rosell Siblings priority rights over any other concession rights in the Bay of Mariel, including any such rights acquired by third persons or entities under previous concessions still in force at the time the 70-year Concession was granted to Maritima Mariel.

87.     The 70-Year Concession granted Maritima Mariel the right to exclude any other person or entity from planning, studying, executing, maintaining or exploiting public docks and warehouses in the Bay of Mariel.

88. Both Maritima Mariel and the 70-Year Concession are part of the Confiscated Property and were specifically identified in Resolution 436 as being confiscated from the Blanco Rosell Siblings by the Cuban Government.

**B.** **Central San Ramón, Compañia Azucarera Mariel S.A., and Land**

89. In addition to the 70-Year Concession and Maritima Mariel, the Blanco Rosell Siblings owned several other companies, including the sugar mill then known as the Central San Ramón, which they purchased in 1949. Central San Ramón was owned and operated by Compañia Azucarera Mariel S.A. ("Azucarera Mariel"), a company wholly owned by the Blanco Rosell Siblings.

90. The Blanco Rosell Siblings also had extensive land holdings (approximately 11,000 acres) southeast, south and west of Mariel Bay which they owned through Central San Ramón and Azucarera Mariel. Those approximately 11,000 acres included numerous improvements such as roads, railways, buildings, and utilities.

91. Azucarera Mariel, Central San Ramón and the 11,000 acres of land are part of the Confiscated Property that were specifically named and confiscated from the Blanco Rosell Siblings by the Cuban Government, in Resolution 436.

**II.** **Cuba's Confiscation of The Confiscated Property And Plaintiffs' Claims To The Confiscated Property Are Publicly Known.**

**A.** **Cuba's Confiscation of the Confiscated Property was Publicly Announced in the Cuba Official Gazette on September 29, 1960**

92. On September 29, 1960, the Cuban Government published Resolution 436 in its Official Gazette on the confiscation without compensation of the property (herein defined as the "Confiscated Property") of Plaintiff Odette Blanco Rosell, who is living, and her siblings, all of whom are now deceased: Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco

Rosell; and Byron Blanco Rosell.[14]   The Confiscated Property includes, *inter alia*, Maritima

Mariel, the 70-year Concession, Central San Ramón, Azucarera Mariel, as well as all the "all

shares or stock certificates representing capital of the entities listed in the [other] Whereas of

[Resolution 436]," which included, *inter alia*, the 70-Year Concession and all the lands owned by

these entities.  *See* Resolution 436 at 23406.

93.     Resolution 436 enumerated the following purposes:

One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.

Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.

Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).

Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960, at 23405

- 23406 (English translation).

94.     The "persons listed in the first Whereas" in Resolution No. 436 above is a reference

to the Blanco Rosell Siblings, who had been the subject of "investigations" carried out by the

Cuban Government.  *See id*. at 23405 (first Whereas clause) ("Whereas: Having considered cases

number 3-2-3143, 3-2-8990 and 3-2-9832, regarding the investigations carried out on the

following persons:  Alfredo, Enrique, Florentino, Byron, and Odette Blanco Rosell.").

---

[14] As stated above in the caption, the claims of Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell, are being pursued by their respective Personal Representatives and Administrators *Ad Litem* respectively.

95.     The Blanco Rosell Siblings' property confiscated by the Cuban Government included all of their "property and rights, whatever their nature," including but not limited to:

> (a) their wholly owned company, Maritima Mariel SA, and the 70-Year Concession held by Maritima Mariel SA, to develop docks, warehouses and port facilities on Mariel Bay, a deep water harbor located on the north coast of Cuba; and
>
> (b) their wholly owned companies, Central San Ramón and Compañia Azucarera Mariel S.A., including those companies' extensive land holdings (approximately 11,000 acres) on the southeast, south and west sides of Mariel Bay, which included a number of improvements such as roads, railways, buildings, and utilities

*See* Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at 23406 (English translation) ("Confiscated Property").

96.     In addition to expressly naming the 70-Year Concession and the above-referenced legal entities, Resolution 436 also expressly named the five Blanco Rosell Siblings as owners of, *inter alia*, the 70-Year Concession, Maritima Mariel, Central San Ramón, and Compañia Azucarera Mariel.

97.     But for Cuba's confiscation in Resolution 436 published in the official Cuban Gazette on September 29, 1960, the 70-year Concession granted in Decree 2367 issued in 1955 would still be in force.  In any event, the 70-year Concession was cut short by Cuba's confiscation of the 70-year Concession.

98.     According to the Cuban Official Gazette as published on September 29, 1960, the confiscation of the Confiscated Property occurred on August 19, 1960. The story of the confiscation by the Cuban Government was reported by the Revolucion newspaper on September 8, 1960.  Both the Cuban Official Gazette and the newspaper Revolucion (now known as Granma following the merger of the Revolucion and Hoy newspapers) are available to the public.

30

B.   **Plaintiffs' Claims to the Confiscated Property have Received Wide-Spread Media Coverage since 2019**

99.    The fact of the confiscation of the Blanco Rosell Siblings' property in Cuba was so well known that, on April 18, 2019, the day after the Trump Administration announced that it would allow Helms-Burton Act lawsuits under Title III to go forward, stories published on both Radio Marti and TV Marti identified Plaintiffs' claims to the Mariel Special Development Zone:

> The Mariel Special Development Zone, the star Cuban project to attract investment, was built on nationalized land where the Carranza-Bernal, Carbonell-González and Blanco-Rosell families owned sugar and hemp processing plants.[15]

100.    In addition to Plaintiffs' claims to the Confiscated Property being on the public record in Cuba since September 29, 1960 (*see supra,* ¶¶ 83-87), Plaintiffs' claims to the Confiscated Property have been on the U.S. public record since at least December 20, 2020, when Plaintiffs sued two major U.S. container cargo shipping companies, including Seaboard's wholly-owned subsidiary Seaboard Marine, and the world's largest container cargo shipping company for trafficking in the Confiscated Property, the claims to which are owned by Plaintiffs.  Plaintiffs' complaints in those lawsuits specifically identify the Confiscated Property and Plaintiffs' claims to the Confiscated Property.[16]

---

[15]    https://www.radiotelevisionmarti.com/a/propiedades-que-ya-podr%C3%ADan-reclamar-en-tribunales-de-eeuu/236777.html/ (last visited August 12, 2021).

[16] *Odette Blanco de Fernandez, et al., v. Seaboard Marine, Ltd.*, Case 1:20-cv-25176-BB (S.D. Fla., Dec. 20, 2020); *Odette Blanco de Fernandez v. Crowley Maritime Corporation*, Case 3:20-cv-01426-BJD-PDB (M.D. Fla., Dec. 20, 2020); *Odette Blanco de Fernandez, et al., v. Crowley Maritime Corporation et al.,* Case 1:21-cv-20443 (S.D. Fla., Feb. 2, 2021); *Odette Blanco de Fernandez, et al. v. A.P. Moller-Maersk A/S et al.*, Case 2:21-cv-00339 (E.D. La., Feb. 17, 2021) *Odette Blanco de Fernandez, et al. v. CMA CGM S.A*, 1:21-cv-22778-MGC (S.D. Fla., Jul. 30, 2021); *Odette Blanco de Fernandez, et al. v. MSC Mediterranean Shipping Company SA*, Case 1:21-cv-23400 (S.D. Fla. Sep. 22, 2021).

101.    In addition, Plaintiffs' lawsuits and Plaintiffs' claims to the Confiscated Property have received U.S. and international news coverage, including shipping company media news coverage, for example:

a.   On December 24, 2020, World News Today published a detailed story about Plaintiffs' first two lawsuits, wherein Plaintiffs' claims were discussed in detail.[17]

b.   On December 25, 2020, On Cuba News published a story titled "Two other lawsuits under Helms-Burton Act set sights on Port of Mariel."[18]

c.   On February 24, 2021, TradeWinds, the self-described "Global Shipping News Source ran an article titled "US-Cuba lawsuits show no signs of slowing down as Maersk sued."[19]

d.   The U.S. - Cuba Trade and Economic Council, Inc. publishes a widely-disseminated blog which reports each and every Helms-Burton lawsuit filing including Plaintiffs' pending lawsuits.[20]

---

[17] https://www.world-today-news.com/florida-companies-sued-for-doing-business-on-land-confiscated-by-cuban-regime/ (last visited August 12, 2021).

[18] https://oncubanews.com/en/cuba-usa/two-other-lawsuits-under-helms-burton-act-set-sights-on-port-of-mariel/ (last visited August 12, 2021).

[19] https://www.tradewindsnews.com/law/us-cuba-lawsuits-show-no-signs-of-slowing-down-as-maersk-sued/2-1-967900 (last visited August 12, 2021).

[20]    https://www.cubatrade.org/blog/2020/12/23/agdh6liz2sexx0emhpw0nrqaphmbnr  Seaboard Marine Is 31st Libertad Act Lawsuit- Plaintiff Targets Mariel Special Economic Zone Operations (last visited August 12, 2021).

https://www.cubatrade.org/blog/2020/12/23/5ms3f5lr8xytqozz63dfr176qxose9           (Crowley Maritime Corporation Is 32nd Libertad Act Lawsuit- Plaintiffs Target Use Of ZEDM Port) (last visited August 12, 2021).

https://www.cubatrade.org/blog/2021/2/18/maersk-worlds-largest-container-shipping-company-is-third-to-be-defendant-in-libertad-act-lawsuit (last visited August 12, 2021).

102.    The Confiscated Property has never been returned to the Blanco Rosell Siblings, nor has adequate and effective compensation ever been paid for the confiscation, including for the 70-Year Concession or any other property interests belonging to Plaintiffs.  Nor have the claims to the Confiscated Property been settled pursuant to an international claims settlement agreement or other settlement procedure.

103.    Plaintiffs never abandoned their claims to the Confiscated Property.

104.    The Blanco Rosell Siblings were not U.S. citizens when the Cuban Government confiscated their Confiscated Property in 1960.  They fled Cuba after the confiscation and became U.S. citizens before March 12, 1996, the date the Helms-Burton Act was signed into law.

105.    The Blanco Rosell Siblings were not eligible to, and therefore did not file claims with the Foreign Claims Settlement Commission under Title V of the International Claims Settlement Act of 1949.

106.    Today, only one of the Blanco Rosell Siblings, Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, age 91, remains alive.

## III.    The Cuban Government Incorporated The Confiscated Property Into The Zona Especial de Desarrollo Mariel ("ZEDM") (a/k/a Mariel Special Economic Zone)

107.    The Zona Especial de Desarrollo Mariel ("ZEDM") (*a/k/a* Mariel Special Economic Zone) is an agency or instrumentality of the Cuban Government.  Created by statute, the ZEDM is a special economic zone in Cuba with its own legal structure.

108.    As stated above, the ZEDM has been referred to in the media as "the star Cuban project to attract investment."

109.    Cuba incorporated the Confiscated Property into the ZEDM without the authorization of Plaintiffs, and therefore the ZEDM traffics in the Confiscated Property.

110.     Starting in or around 2009, the Government of Cuba and various non-Cuban corporate partners rebuilt the Port of Mariel and constructed a Container Terminal in the ZEDM.

111.     The ZEDM's Container Terminal subsumes the 70-Year Concession rights, pursuant to which the Blanco Rosell Siblings possessed the right, among other things, "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel, province of Pinar del Rio, and the construction of new buildings and works…"  *See* Decree 2367 at 13865.

112.     The Blanco Rosell Siblings' extensive land holdings on the southeast, south and west sides of Mariel Bay, all of which are part of the Confiscated Property, cover virtually every square meter of ZEDM Sector A5, which the ZEDM operates as a logistics zone, as well as portions of Sector A7 where the ZEDM's Container Terminal is located.

113.     The 70-Year Concession encompasses all of Mariel Bay, including, but not limited to ZEDM Sector A5, where AUSA's container storage yard is located and Sector A7, where the ZEDM's Container Terminal is located.  The following map illustrates that ZEDM Sector A7 encompasses the shoreline of Mariel Bay and land adjacent to the shoreline, areas that are subject to the 70-Year Concession:



114.   The ZEDM, Container Terminal, and AUSA are trafficking in the Blanco Rosell

Siblings' Confiscated Property within the meaning of Title III because the ZEDM:

(i)      … transfers, distributes, dispenses, brokers, manages, or … leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in [the Confiscated Property];

(ii)     engages in a commercial activity using or otherwise benefitting from [the Confiscated Property],

(iii)    causes, directs, participates in, or profits from trafficking (as described clause (i) or (ii) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii) through another person

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A).

115.   Those who "plan, study, execute, maintain and exploit public docks and

warehouses in Mariel Bay, Pinar del Rio Province, and the construction of new buildings and

works" (Decree 2367 at 13865) are trafficking in Plaintiffs' Confiscated Property, including the 70-Year Concession.

### IV.     Seaboard's Trafficking

116.     Seaboard and Seaboard Marine have, since at least May 2019, trafficked in the Confiscated Property, by purposefully directing container ships (the Trafficking Vessels) from the port of New Orleans, Louisiana and other U.S. Ports to call at the Container Terminal—which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel in Cuba—either directly or by causing, directing, participating in, or profiting from trafficking by or through one or more other persons.

117.     On May 9, 2019, only one week after the Trump Administration allowed the suspension of Title III to lapse, and thus activated the ability of plaintiffs to bring causes of action under Title III, Defendant Seaboard by and through its wholly-owned subsidiary, non-party Seaboard Marine commenced Seaboard and Seaboard Marine's first trafficking voyage to the Port of Mariel to traffic in the Confiscated Property, the claims to which are owned by Plaintiffs.

118.     Specifically, according to the International Maritime Organization ("IMO"), a specialized agency of the United Nations responsible for regulating shipping, the vessel AS PETULIA (IMO # 9374454), while operated by Seaboard Marine, sailed from the Port of New Orleans directly to the Port of Mariel where it called at the TCM, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel[21] and, while calling at the Container Terminal,

---

[21] As used in this Complaint, the "Port of Mariel" comprises more than 2,300 feet of wharf space, four super Post-Panamax cranes, and the capacity to handle 820,000 cargo containers annually through the Port's Container Terminal which is the single largest user of the ZEDM.  *See* Mariel is Cuba's big industrial gamble. Could U.S. companies be among investors? Miami Herald, Oct. 23, 2017, available at https://www.miamiherald.com/article180057406.html (last visited August 12, 2021).  Exhibit A hereto.  *See also* Port of Mariel New Transport Hub for the Americas,

engaged in commercially beneficial transactions and other commercial activities with the Container Terminal, AUSA, and/or the ZEDM.

119. "Calling" or "to call" at a port, in the container shipping industry, means that ship containers are either offloaded or loaded at a Port of Call. *See* https://www.marineinsight.com/life-at-sea/what-does-the-term-port-of-call-means/ (last visited August 12, 2021). While calling at the Port of Mariel, the vessels operated by Seaboard Marine dock and utilize wharf space, offload and/or load containers, hook up to water and electricity, and utilize crane service, container storage yards, warehouses and other storage space to store the containers, as well as road, rail and wheeled means of conveyance for the containers it unloads. Seaboard Marine contracts for and pays for these and other services at the Port of Mariel with the TCM, AUSA, and/or the ZEDM.

120. The AS PETULIA's May 9, 2019 trafficking voyage at the Port of Mariel was the first of at least twenty-nine trafficking voyages to the Port of Mariel by vessels operated by Seaboard Marine, including seven other trafficking voyages by the AS PETULIA and multiple trafficking voyages by the AS PATRIA (IMO # 9294525), NORDBALTIC (IMO # 9241475), SEABOARD ATLANTIC (IMO # 9395563), SEABOARD PATRIOT (IMO # 9395551), and ARSOS (IMO # 9395123) (collectively, the "Trafficking Vessels"). *See infra* ¶ 127.

121. Defendant Seaboard is the beneficial owner of the SEABOARD ATLANTIC and the SEABOARD PATRIOT. Non-party Seaboard Atlantic Ltd. ("Seaboard Atlantic"), a subsidiary of Seaboard, is the registered owner of the SEABOARD ATLANTIC. Non-party Seaboard Patriot Limited, a subsidiary of Seaboard, is the registered owner of the SEABOARD PATRIOT.

---

https://www.caribbeanshipping.org/images/CSEC2016/Presentation_TC_Mariel_English_170516.pdf (last visited April 29, 2021). Exhibit B hereto (redacted to remove data regarding other Cuban ports) (last visited August 12, 2021).

122.     Defendant Seaboard and non-party Seaboard Marine purposefully and repeatedly directed the Trafficking Vessels to call at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel.  Each of the Trafficking Vessels, for themselves and on behalf of and/or at the direction of Defendant and non-party Seaboard Marine, called at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, and engaged in commercially beneficial transactions and other commercial activities with the Container Terminal, AUSA, and/or the ZEDM including, but not limited to, offloading and loading containers, thereby using or otherwise benefiting from the Confiscated Property, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

123.     Defendant Seaboard and non-party Seaboard Marine knowingly and intentionally directed the Trafficking Vessels to call at the Port of Mariel to engage in commercially beneficial transactions and other commercial activities—including, but not limited to, calling at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, and offloading and loading containers at the Container Terminal—whereby Seaboard and non-party Seaboard Marine, caused, directed, participated in, or profited from trafficking by another person, or otherwise engaged in trafficking through another person without the authorization of Plaintiffs which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

124.     Defendant Seaboard, a publicly-traded (NYSE) company, did not report its Cuba business or that it received revenues and profits from its Cuba business in its February 16, 2021 Annual Report Pursuant to Section 13 or 15(D) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2020 ("Annual Report").[22]

---

[22] https://www.sec.gov/ix?doc=/Archives/edgar/data/88121/000008812121000013/seb-20201231x10k.htm#item1 (last visited August 12, 2021).

125.    Seaboard's Annual Report is signed by Robert L. Steer, Seaboard's President and Chief Executive Officer, as well as by Seaboard's officers and directors:  David H. Rankin; Michael D. Trollinger; Ellen S. Bresky; Douglas Baena; David A. Adamsen; Edward I. Shifman, Jr.; and Paul M. Squires.  *Id.* at 68.

126.    When at the Port of Mariel, the Trafficking Vessels call at, and/or otherwise use, benefit, and profit from the Container Terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities.  Containers from the Trafficking Vessels are offloaded at the Container Terminal in ZEDM Sector 7 and stored in the container storage yard operated by AUSA in ZEDM Sector A5.  Defendant also engages in commercially beneficial activities and arrangements using or otherwise benefitting from the Plaintiffs' Confiscated Property and acts of trafficking by the Container Terminal, AUSA and the ZEDM which make Defendant's container business at the Port of Mariel possible and profitable.

127.    According to the International Maritime Organization ("IMO"), a specialized agency of the United Nations responsible for regulating shipping, Seaboard Marine operates the Trafficking Vessels, which have called at the Port of Mariel multiple times since May 9, 2019, and Seaboard Marine also has acted as the carrier for cargo shipments from the U.S. to the Port of Mariel multiple times, including the following:

| IMO No. | Est. Arrival | Ship Name | Operator and/or Carrier |
|---------|--------------|-----------|-------------------------|
| 9374454 | May 9, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9294525 | Jun. 3, 2019 | AS PATRIA | Seaboard Marine Ltd |
| 9374454 | Jun. 18, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9294525 | Jun. 24, 2019 | AS PATRIA | Seaboard Marine Ltd |
| 9241475 | Jul. 2, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Jul. 8, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Jul. 23, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Jul. 30, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9294525 | Aug. 5, 2019 | AS PATRIA | Seaboard Marine Ltd |

| 9241475 | Aug. 13, 2019 | NORDBALTIC | Seaboard Marine Ltd |
|---|---|---|---|
| 9374454 | Aug. 20, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Sep. 3, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Sep. 9, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Nov. 25, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Dec. 18, 2019 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Apr. 15, 2020 | AS PETULIA | Seaboard Marine Ltd |
| 9395551 | May 17, 2020 | SEABOARD PATRIOT | Seaboard Marine Ltd |
| 9283708 | May 17, 2020 | AS PETRA | Seaboard Marine Ltd |
| 9241475 | Jun. 21, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Jul. 6, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Jul. 7, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9395563 | Jul. 23, 2020 | SEABOARD ATLANTIC | Seaboard Marine Ltd |
| 9374454 | Jul. 23, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9374454 | Jul. 30, 2019 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Aug. 2, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9283708 | Aug. 10, 2020 | AS PETRA | Seaboard Marine Ltd |
| 9374454 | Aug. 17, 2020 | AS PETULIA | Seaboard Marine Ltd |
| 9374454 | Sep. 8, 2020 | AS PETULIA | Seaboard Marine Ltd |
| 9374454 | Sep. 27, 2020 | AS PETULIA | Seaboard Marine Ltd |
| 9374454 | Oct. 22, 2020 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Oct. 29, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9294513 | Nov. 1, 2020 | AS PALATIA | Seaboard Marine Ltd |
| 9241475 | Nov. 21, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Dec. 13, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9294513 | Dec. 25, 2020 | AS PALATIA | Seaboard Marine Ltd |
| 9294513 | Jan. 7, 2021 | AS PALATIA | Seaboard Marine Ltd |
| 9241475 | Jan. 21, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Feb. 1, 2021 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Feb. 15, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Feb. 27, 2021 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | March 9, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Mar. 9, 2021 | AS PETULIA | Seaboard Marine Ltd |
| 9294513 | Apr. 3, 2021 | AS PALATIA | Seaboard Marine Ltd |
| 9374454 | Apr. 19, 2021 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | May 5, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9395123 | May 18, 2021 | ARSOS | Seaboard Marine Ltd |
| 9294513 | May. 22, 2021 | AS PALATIA | Seaboard Marine Ltd |
| 9374454 | Jun. 6, 2021 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Jun. 23, 2021 | NORDBALTIC | Seaboard Marine Ltd |

| 9294513 | Jul. 3, 2021 | AS PALATIA | Seaboard Marine Ltd |
|---------|-------------|------------|---------------------|
| 9374454 | Jul. 18, 2021 | AS PETULIA | Seaboard Marine Ltd |
| 9294513 | Aug. 13, 2021 | AS PALATIA | Seaboard Marine Ltd |
| 9241475 | Sep. 17, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Oct. 8, 2021 | NORDBALTIC | Seaboard Marine Ltd |

128.    The Trafficking Vessels were knowingly and intentionally directed by Defendant and non-party Seaboard Marine to the Port of Mariel, where each of them, for themselves and on behalf of and/or at the direction of Defendant, called at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, and engaged in commercially beneficial transactions and other commercial activities—including, but not limited to, offloading and loading containers at the Container Terminal—thereby using or otherwise benefiting from the Confiscated Property, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

129.    In addition, while at the Port of Mariel, the Trafficking Vessels engaged in commercially beneficial transactions and other commercial activities—including, but not limited to, offloading and loading containers at the Container Terminal—whereby Defendant and non-party Seaboard Marine for themselves caused, directed, participated in, or profited from trafficking by another person, or otherwise engaged in trafficking through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

130.    Seaboard Marine also knowingly and intentionally carried cargo from the United States, to the Port of Mariel and directed ships to call at the Port of Mariel to engage in commercially beneficial transactions and other commercial activities—including, but not limited to, calling at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, and offloading and loading containers of cargo carried by Seaboard Marine at the Container Terminal whereby Seaboard Marine and Defendant, caused, directed, participated in, or profited from trafficking by other persons such as one or more of TCM, AUSA,

and ZEDM, or otherwise engaged in trafficking through one or more of TCM, AUSA, and ZEDM without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

131.    Officers and/or Directors of Defendant Seaboard know that non-party Seaboard Marine does business with the ZEDM and in the ZEDM.

132.    In September 2020, Plaintiffs, through counsel, sent Defendant Seaboard and non-party Seaboard Marine notice letters pursuant to 22 U.S.C. § 6082(a)(3)(D) ("Notice Letters") notifying Defendant Seaboard and non-party Seaboard Marine that each is trafficking in confiscated property as defined in the Helms-Burton Act, the claims to which are owned by Plaintiffs, without the authorization of Plaintiffs.  The table below shows the dates that Defendant Seaboard and non-party Seaboard Marine received these letters by various methods including Certified Mail, FedEx and Messenger.

| Recipient | Certified Mail Received | FedEx Received | Messenger Delivery |
|---|---|---|---|
| Seaboard Marine | 9/26/20 | 9/21/20 | 9/28/20 |
| Defendant | 9/23/20 | 9/21/20 | 9/28/20 |

133.    Neither Defendant Seaboard nor non-party Seaboard Marine has responded to Plaintiffs' Notice Letters.  Likewise, they have not sought to obtain Plaintiffs' authorization to traffic in the Confiscated Property.

134.    Even after Defendant Seaboard and non-party Seaboard Marine received Plaintiffs' Notice Letters, giving them actual notice of Plaintiffs' claims, Defendant Seaboard and non-party Seaboard Marine continued to traffic in the Confiscated Property, the claims to which are owned by Plaintiffs, including at least twelve trafficking voyages that were undertaken more than 30 days

after Defendant Seaboard and non-party Seaboard Marine received Plaintiffs' Notice Letters in September 2020:

| IMO No. | Arrival Date | Ship Name | Operator and/or Carrier |
|---------|--------------|-----------|-------------------------|
| 9241475 | Nov. 21, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Dec. 13, 2020 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Jan. 21, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Feb. 15, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9374454 | Feb. 27, 2021 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Mar. 9, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9395123 | May 18, 2021 | ARSOS | Seaboard Marine Ltd |
| 9374454 | Jun. 6, 2021 | AS PETULIA | Seaboard Marine Ltd |
| 9241475 | Jun. 23, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9348986 | July 9, 2021 | CARIBBEAN EXPRESS | Seaboard Marine Ltd |
| 9241475 | Sep. 17, 2021 | NORDBALTIC | Seaboard Marine Ltd |
| 9241475 | Oct. 8, 2021 | NORDBALTIC | Seaboard Marine Ltd |

135.   Because neither Defendant Seaboard nor non-party Seaboard Marine obtained the authorization of Plaintiffs with regard to these acts of trafficking, Plaintiffs were injured by Defendant Seaboard's and non-party Seaboard Marine's acts of trafficking in the Confiscated Property to which Plaintiffs own claims.

136.   By and through the acts of trafficking of the SEABOARD ATLANTIC, SEABOARD PATRIOT, AS PETULIA, AS PATRIA, NORDBALTIC, ARSOS and other vessels in the Confiscated Property, which were undertaken and done without the authorization of Plaintiffs, Defendant Seaboard and non-party Seaboard Marine trafficked in the Confiscated Property either directly or by causing, directing, participating in, or profiting from trafficking by or through the SEABOARD ATLANTIC, SEABOARD PATRIOT, AS PETULIA, AS PATRIA, NORDBALTIC, ARSOS and other vessels and/or one another and/or non-party Seaboard Marine.

137.   Because Defendant Seaboard and non-party Seaboard Marine did not obtain the authorization of Plaintiffs with regard to these acts of trafficking, occurring both before and after

receiving the Notice Letter, Plaintiffs were injured by Defendant Seaboard and non-party Seaboard Marine's acts of trafficking in the Confiscated Property to which Plaintiffs own claims and Defendant Seaboard is subject to treble damages.

138.   Plaintiffs have been injured by Seaboard's unauthorized acts of trafficking in the confiscated property to which Plaintiffs own claims because, *inter alia*:

(a)   Seaboard is profiting without obtaining consent from or paying adequate compensation to Plaintiffs;

(b)   Plaintiffs are not receiving the benefit of their interests in the Confiscated Property;

(c)   Seaboard is profiting without obtaining authorization or paying adequate compensation to Plaintiffs for authorization to traffic in the confiscated property;

(d)   Seaboard is profiting or otherwise benefiting from trafficking in the Confiscated Property by or through others without obtaining authorization from, or paying adequate compensation to, Plaintiffs;

(e)   Seaboard's trafficking in the Confiscated Property has undermined Plaintiffs' rights to compensation for the Confiscated Property;

(f)   Seaboard has profited from its use of the Confiscated Property at Plaintiffs' expense;

(g)   Seaboard has denied Plaintiffs the ability to obtain economic rent that could have been negotiated for in exchange for their authorization for Seaboard to traffic in the Confiscated Property;

(h)     Seaboard has appropriated from Plaintiffs the leverage from the Helms-Burton Act that Plaintiffs would have had on the Cuban Government to negotiate compensation for their Confiscated Property;

(i)     Seaboard has injured Plaintiffs by trafficking in the Confiscated Property without Plaintiffs' authorization and without making any payment of compensation to Plaintiffs because in the Helms-Burton Act, Congress provided the rightful owners of confiscated property with the right to be compensated from defendants who have economically exploited the confiscated property;

(j)     Defendant has injured Plaintiffs by trafficking in the particularized Confiscated Property to which Plaintiffs own claims without seeking or obtaining Plaintiffs' authorization to traffic in that particularized Confiscated Property and as a result Defendant's failure to do so has resulted in concrete and particularized monetary harm and injury to Plaintiffs;

(k)     The harms and injuries suffered by Plaintiffs as a result of Defendant's failure to obtain Plaintiffs' authorization to traffic in the Confiscated Property have a close relationship to traditionally recognized common-law actions for unjust enrichment, trespass, trespass to chattels, and conversion;

(l)     There is a direct causal link between Plaintiffs' injuries from the Cuban Government's confiscation of the Confiscated Property and Defendant's unjust enrichment, trespass, trespass to chattels, and/or conversion from

45

Defendant's commercially beneficial use of the Confiscated Property without Plaintiffs' authorization; and

(m)    Seaboard's trafficking in the Confiscated Property without Plaintiffs' authorization has caused a concrete injury to Plaintiffs that is traceable to Seaboard and has a close relationship to harms traditionally recognized providing a basis for a lawsuit in American courts – such as unjust enrichment, trespass, trespass to chattels and conversion.

139.    On December 20, 2020, Plaintiff Odette Blanco de Fernandez sued Seaboard Marine in the U.S. District Court for the Southern District of Florida for trafficking in the Confiscated Property the claims to which are owned by Plaintiffs.   Complaint (Doc. 1), *De Fernandez v. Seaboard Marine, Ltd.*, Case 1:20-cv-25176-BB (Dec. 20, 2020).

**CLAIM FOR DAMAGES**
**TITLE III OF THE HELMS-BURTON ACT**

140.    Plaintiffs incorporate by reference all of the foregoing paragraphs as if fully stated herein.

141.    This case is brought pursuant to Title III of the Helms-Burton Act, 22 U.S.C. § 6082.

142.    Defendant did traffic, as the term "traffic" is defined in 22 U.S.C. § 6023(13), in the Confiscated Property without authorization of Plaintiffs who own claims to the Confiscated Property.   Defendant is therefore liable to Plaintiffs under the Helms-Burton Act.

143.    Defendant Seaboard has trafficked in the Confiscated Property, by knowingly and intentionally directing the Trafficking Vessels to call at the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through another person.   When in the Port of Mariel, the Trafficking Vessels call at and/or otherwise use, benefit,

and profit from the Container Terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities. Defendant also engages in commercially beneficial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

144. Defendant is therefore trafficking in Plaintiffs' Confiscated Property and benefits or profits from the trafficking of the Container Terminal, AUSA, and the ZEDM in Plaintiffs' Confiscated Property.

145. Defendant also knowingly and intentionally participated in, benefitted from, and profited from the Container Terminal, AUSA, and the ZEDM's trafficking in the Confiscated Property including, but not limited to, the 70-Year Concession, without the authorization of Plaintiffs.

146. Defendant's willingness to engage knowingly and intentionally in conduct directly contravening the foreign policy of the United States—including by providing support for and hard currency to Cuba, a designated State Sponsor of Terrorism—is demonstrated by its extensive business dealings with known Hezbollah financiers, as alleged above.

147. Defendant engages in commercially beneficial activities using or otherwise benefitting from the Confiscated Property, including, but not limited to, the 70-Year Concession.

148. Defendant also causes, directs, participates in, or profits from trafficking by the Container Terminal, AUSA, and the ZEDM in the Confiscated Property, including the 70-Year Concession.

149. Defendant has had actual knowledge of Plaintiffs' claims to the Confiscated Property since at least September 2020, due to Plaintiffs' Notice Letter to Defendant mentioned above.

150.     Prior to Defendant's receipt of Plaintiffs' Notice Letter to Defendant, Defendant knew or had reason to know that Plaintiffs owned claims to the Confiscated Property.

151.     Prior to Defendant's receipt of Plaintiffs' Notice Letter to Defendant, Defendant knew or had reason to know that the ZEDM was trafficking in the Confiscated Property.

152.     As of January 5, 2021, when Defendant's wholly-owned subsidiary, Seaboard Marine, was served with Plaintiff Odette Blanco de Fernandez's Summons and Complaint in *De Fernandez v. Seaboard Marine, Ltd.,* Case 1:20-cv-25176-BB (S.D. Fla.), Defendant had further actual knowledge of Plaintiffs' claims to the Confiscated Property.

153.     Defendant's continued trafficking in the Confiscated Property, including in the 70-Year Concession, more than 30 days after its receipt of Plaintiffs' Notice Letter, subjects Defendant to treble damages.  22 U.S.C. § 6082(a)(3).

154.     The Container Terminal, AUSA, and the ZEDM did not ever seek or obtain Plaintiffs' authorization to traffic in the Confiscated Property, including the 70-Year Concession, the land, or any other Confiscated Property at any time.

155.     The Container Terminal, AUSA, and the ZEDM's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking as defined in 22 U.S.C. § 6023(13).

156.     Defendant did not seek nor obtain Plaintiffs' authorization to traffic in the Confiscated Property, including in the 70-Year Concession or any other property interests at any time.

157.     Defendant's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking as defined in 22 U.S.C. § 6023(13).

158.    As a result of Defendant's trafficking in the Confiscated Property, Defendant is liable to Plaintiffs for all money damages allowable under 22 U.S.C. § 6082(a) including, but not limited to, those equal to:

a.      The amount which is the greater of: … (i) the amount determined by a special master pursuant to 22 U.S.C. § 6083(a)(2); or (ii) the "fair market value" of the Confiscated Property, plus interest;

b.      Three times the amount determined above (treble damages);

c.      Prejudgment interest; and

d.      Court costs and reasonable attorneys' fees, and expenses.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

A.      Awarding damages as allowed by law including treble damages and pre-filing interest as provided by the Act;

B.      Awarding prejudgment interest as allowed by law on any amounts awarded;

C.      Awarding attorneys' fees, costs, and expenses; and

D.      Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury.

Dated:  October 21, 2021                    CROSS & SIMON LLC

                                            /s/ Michael L. Vild
                                            Michael L. Vild (#3042)
                                            1105 N. Market Street, Suite 901
                                            Wilmington, Delaware 19801
                                            Tel:  (302) 777-4200
                                            Facsimile: (302) 777-4224
                                            mvild@crosslaw.com


                                            BERLINER CORCORAN & ROWE LLP
                                            David A. Baron
                                            (admitted *pro hac vice*)
                                            Melvin White
                                            (admitted *pro hac vice*)
                                            Laina C. Lopez
                                            (admitted *pro hac vice*)
                                            1101 17th Street, N.W., Suite 1100
                                            Washington, D.C. 20036-4798
                                            Tel:  (202) 293-5555
                                            Facsimile:  (202) 293-9035
                                            dbaron@bcr-dc.com
                                            mwhite@bcr-dc.com
                                            llopez@bcr-dc.com


                                            FIELDS PLLC
                                            Richard W. Fields
                                            (admitted *pro hac vice*)
                                            Martin F. Cunniff
                                            (admitted *pro hac vice*)
                                            Edward Han (admitted *pro hac vice*)
                                            1701 Pennsylvania Ave, N.W., Suite 200
                                            Washington, D.C. 20006
                                            Tel:  (833) 382-9816
                                            fields@fieldslawpllc.com
                                            MartinCunniff@fieldslawpllc.com
                                            edhan@fieldslawpllc.com

                                            *Counsel for Plaintiffs*