# EXHIBIT A

Nos. 20-12407, 20-12960, 20-14251

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————

MARIO DEL VALLE, *et al.*,

Plaintiffs-Appellants,

v.

TRIVAGO GMBH, *et al.*,

Defendants-Appellees.

————————

| JAVIER GARCIA-BENGOCHEA, | JAVIER GARCIA-BENGOCHEA, |
|---|---|
| Plaintiff-Appellant, | Plaintiff-Appellant, |
| v. | v. |
| CARNIVAL CORPORATION, | ROYAL CARIBBEAN CRUISES, LTD. |
| Defendant-Appellee. | Defendant-Appellee. |

————————

On Appeal from the United States District Court
for the Southern District of Florida

————————

**BRIEF FOR UNITED STATES AS AMICUS CURIAE**

————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JUAN ANTONIO GONZALEZ
*United States Attorney*

SHARON SWINGLE
LEWIS S. YELIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7239*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3425*

*Del Valle v. Trivago GMBH, No. 20-12407; Garcia-Bengochea v. Carnival Corp., No. 20-12960; Garcia-Bengochea v. Royal Caribbean Cruises, Ltd., No. 20-14251*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-2(c), I hereby certify that the United States is not aware of any persons or entities having an interest in the outcome of these appeals in addition to those already identified by the parties.

*s/ Lewis S. Yelin*
Counsel for the United States

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF THE UNITED STATES ........................................... 1

STATEMENT OF THE ISSUES ...................................................... 1

STATEMENT OF THE CASE ........................................................... 2

I.     Statutory Background ............................................................. 2

II.    Procedural Background........................................................... 7

III.   Standard of Review ...............................................................13

SUMMARY OF ARGUMENT.........................................................13

ARGUMENT ...................................................................................16

I.     The Meaning of "United States National" and "Acquire" and the
       Law Governing Property Acquired by Inheritance ................17

       A.     The Meaning of "United States national" in 22 U.S.C.
              § 6082(a)(4)(B) & (C)............................................................18

       B.     The Meaning of "Acquires" in 22 U.S.C. § 6082(a)(4)(B),
              the Import of "Assignment for Value" in 22 U.S.C.
              § 6082(a)(4)(C), and the Law Governing Inheritance .................23

II.    The Effect of the President's Suspension Authority .............28

III.   The "Incident to Lawful Travel" Exclusion .............................30

CONCLUSION................................................................................39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Barnhill v. Johnson,*
    503 U.S. 393 (1992) ...........................................................................27

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
    139 S. Ct. 1507 (2019)................................................................. 21-22

*Federal Trade Comm'n v. Morton Salt Co.,*
    334 U.S. 37 (1948) .............................................................................38

*Glen v. American Airlines, Inc.,*
    7 F.4th 331 (5th Cir. 2021) ..............................................................27

*Gonzalez v. Amazon.com, Inc.,*
    835 F. App'x 1011 (11th Cir. 2021) .................................................27

*Jama v. Immigration & Customs Enf.,*
    543 U.S. 335 (2005) ...........................................................................26

*Javierre v. Central Altagracia,*
    217 U.S. 502 (1910).............................................................................38

*Lomax v. Ortiz-Marquez,*
    140 S. Ct. 1721 (2020) .......................................................................21

*Meacham v. Knolls Atomic Power Lab.,*
    554 U.S. 84 (2008) .............................................................................38

*Old W. Annuity & Life Ins. Co. v. Apollo Grp.,*
    605 F.3d 856 (11th Cir. 2010) .........................................................28

*Ramirez v. Statewide Harvesting & Hauling, LLC,*
    997 F.3d 1356 (11th Cir. 2021) .......................................................13

*Regan v. Wald,*
    468 U.S. 222 (1984) ...........................................................................33

*Schaffer ex rel. Schaffer v. Weast,*
    546 U.S. 49 (2005) .............................................................................38

*Spencer v. Specialty Foundry Prods. Inc.*,
   953 F.3d 735 (11th Cir. 2020) ............................................... 23-24, 24

*United States v. Quality Stores, Inc.*,
   572 U.S. 141 (2014) ................................................................33

*Vann In re*,
   67 F.3d 277 (11th Cir. 1995) ...................................................10

## Statutes:

Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996,
   Pub. L. No. 104-114, 110 Stat. 785 (codified at 22 U.S.C. § 6021 *et seq.*).......1
   22 U.S.C. § 6022(6) .............................................................2
   22 U.S.C. § 6023 ................................................................3
   22 U.S.C. § 6023(13)(A)(ii) ....................................................2
   22 U.S.C. § 6023(13)(A)(iii) ...................................................2
   22 U.S.C. § 6023(13)(B)(i) .....................................................3
   22 U.S.C. § 6023(13)(B)(ii) ....................................................3
   22 U.S.C. § 6023(13)(B)(iii) .................................3, 12, 15, 30, 34
   22 U.S.C. § 6023(13)(B)(iv) ....................................................3
   22 U.S.C. § 6023(15) .......................................................18, 22
   22 U.S.C. § 6082(a)(1)(A) ...............................2, 5, 17, 18, 27
   22 U.S.C. § 6082(a)(4) ........................................................18
   22 U.S.C. § 6082(a)(4)(B) .............3, 9, 13, 14, 18, 19, 23, 25, 27
   22 U.S.C. § 6082(a)(4)(C) .............3, 10, 13, 14, 18, 19, 23, 26
   22 U.S.C. § 6082(a)(5)(A) ...........................................4, 20, 23
   22 U.S.C. § 6082(a)(5)(B) .....................................................20
   22 U.S.C. § 6082(a)(5)(D) ..................................................4, 21
   22 U.S.C. § 6083(a) ...........................................................4
   22 U.S.C. § 6083(a)(1) .....................................................4, 22
   22 U.S.C. § 6083(a)(2) .....................................................5, 23
   22 U.S.C. § 6085(a) ...........................................................5
   22 U.S.C. § 6085(b) ...........................................................5
   22 U.S.C. § 6085(b)(1) .....................................................5, 29
   22 U.S.C. § 6085(b)(2) .........................................................5
   22 U.S.C. § 6085(c)(1) .........................................................5
   22 U.S.C. § 6085(c)(1)(B) .....................................................29
   22 U.S.C. § 6085(c)(2) .........................................................5

International Claims Settlement Act of 1949,
22 U.S.C. § 1643 *et seq.* ................................................................3
22 U.S.C. § 1643c(a) ...................................................11

22 U.S.C. § 7209(b) ........................................................................31

## Regulations:

15 C.F.R. § 746.2 ...........................................................................31, 34

31 C.F.R. § 501.801(a) ...................................................................32, 33

31 C.F.R. § 501.801(b) ...................................................................32

31 C.F.R. pt. 515 ............................................................................31
31 C.F.R. § 515.201 ...............................................................31
31 C.F.R. § 515.201 (1995) ....................................................33
31 C.F.R. § 515.421(a) ...........................................15, 32, 34, 35
31 C.F.R. § 515.421(b) ...........................................................35
31 C.F.R. § 515.560(a) ....................................................12, 32
31 C.F.R. § 515.560(b) ...........................................................33
31 C.F.R. § 515.560(c) ...........................................................32
31 C.F.R. § 515.560 (1995) ....................................................33
31 C.F.R. § 515.565 ...............................................................32
31 C.F.R. § 515.572(a) ...........................................................12
31 C.F.R. § 515.572(a)(1) .......................................................32
31 C.F.R. § 515.572(b)(1) .......................................................37

## Legislative Material:

H.R. Rep. No. 104-468 (1996) (Conf. Rep.) ..................................10, 29

## Other Authorities:

*Acquire*:
Black's Law Dictionary (6th ed. 1990) ....................................9, 24, 25
Black's Law Dictionary (11th ed. 2019) ...................................9
Oxford English Dictionary (2d ed. 1989) ................................24, 25

Statement on Action on Title III of the Cuban Liberty and Democratic
   Solidarity (LIBERTAD) Act of 1996, 2 Pub. Papers 1136 (July 16, 1996),
   https://go.usa.gov/xz5nn ........................................................................ 5-6, 6

*Delegation of Authority To Suspend the Provisions of Title III*
   *of the Cuban Liberty and Democratic Solidarity (LIBERTAD)*
   *Act of 1996*, 78 Fed. Reg. 9573 (Feb. 8, 2013) .................................................6

Foreign Claims Settlement Comm'n of the U.S., *Final Report*
   *of the Commission's First Cuba Claims Program* (1972),
   https://go.usa.gov/xtM6T ......................................................................................4

*Inherit*:
   Black's Law Dictionary (6th ed. 1990).......................................................25
   Oxford English Dictionary (2d ed. 1989)...........................................24, 25

OFAC:
   *Contact OFAC*, https://go.usa.gov/xtznW ...........................................36
   *Frequently Asked Questions*, https://go.usa.gov/xzP92...........................36
   *Frequently Asked Questions, Cuba Sanctions, No. 712*,
      https://go.usa.gov/xzPX8.............................................................36

Office of the Spokesperson, U.S. Dep't of State,
   *Secretary's Determination of Six Months' Suspension*
   *Under Title III of LIBERTAD Act* (June 28, 2018),
   https://perma.cc/6NFX-675Q ...........................................................................6

*Reporting and Procedures Regulations: Consolidation of*
   *Information Collections*, 62 Fed. Reg. 45,098 (Aug. 25, 1997) ....................31

Secretary of State Michael R. Pompeo, U.S. Dep't of State,
   *Remarks to the Press* (April 17, 2019), https://perma.cc/2JPQ-X4TG ..........6

## INTEREST OF THE UNITED STATES

The United States deplores the nationalization and expropriation of property of U.S. nationals by the Cuban government in the strongest terms and has repeatedly communicated to the Cuban government the need to provide compensation for such takings of property. The United States also condemns the trafficking in nationalized and expropriated property by the Cuban government and others. It is the longstanding policy of the United States to achieve compensation for U.S. nationals with outstanding claims related to Cuban expropriations. The United States files this brief in response to the Court's order of December 20, 2021, inviting the views of the United States on the questions posed by the Court about the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, Pub. L. No. 104-114, 110 Stat. 785 (codified at 22 U.S.C. § 6021 *et seq.*). This brief responds to the Court's legal questions concerning the interpretation of Title III of the LIBERTAD Act and does not address any issues of policy concerning Title III.

## STATEMENT OF THE ISSUES

The six sets of questions posed by the Court are set out below in the body of the brief, followed by the United States' responses.

## STATEMENT OF THE CASE

## I.   Statutory Background

In the LIBERTAD Act, Congress sought, among other things, "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. § 6022(6).  To that end, Title III of the statute creates a judicial remedy for certain United States nationals whose property was confiscated by Cuba after the Castro regime came to power in 1959.  The statute generally makes those who "traffic[]" in such property liable for damages to a United States national "who owns the claim to such property." *Id.* § 6082(a)(1)(A).

The statute broadly defines "[t]raffics" as "knowingly and intentionally" engaging in, among other things, "a commercial activity using or otherwise benefiting from confiscated property," either directly or through another person, "without the authorization of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A)(ii), (iii). The statute excludes from the definition of "[t]raffics" any "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such

2

travel." *Id.* § 6023(13)(B)(iii); *see id.* § 6023(13)(B)(i), (ii), (iv) (other exclusions).

Congress imposed certain limits on the LIBERTAD Act's right of action. The first set of limits relates to the date Cuba confiscated the property and the date the United States national acquired ownership of the claim or the manner of acquisition. If Cuba confiscated the property before the statute was enacted, "a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996," *i.e.*, the date of enactment. 22 U.S.C. § 6082(a)(4)(B). If Cuba confiscated the property on or after the date of enactment, "a United States national who, after the property is confiscated, acquires ownership of a claim to the property by assignment for value, may not bring an action on the claim under this section." *Id.* § 6082(a)(4)(C). The statute does not define the term "acquires." *Cf. id.* § 6023 (definitions).

The second set of limits concerns claims that were or could have been considered by the Foreign Claims Settlement Commission of the United States. Under Title V of the International Claims Settlement Act of 1949, 22 U.S.C. § 1643 *et seq.*, the Foreign Claims Settlement Commission was

authorized to determine the validity and amount of claims of United States nationals against the Government of Cuba resulting from Cuba's nationalization of property after the Cuban Revolution. *See* Foreign Claims Settlement Comm'n of the U.S., *Final Report of the Commission's First Cuba Claims Program* 69 (1972), https://go.usa.gov/xtM6T, (*FCSC Cuba Report*). If "a United States national … was eligible to file a claim with" the Commission but did not do so, that person "may not bring an action on that claim under" the LIBERTAD Act. 22 U.S.C. § 6082(a)(5)(A). In addition, "[a]n interest in property for which a United States national has a claim certified" by the Commission "may not be the subject of a claim in an action under this section by any other person." *Id.* § 6082(a)(5)(D).

The LIBERTAD Act also creates rules governing the "[e]vidence of ownership" of a claim to property confiscated by Cuba. 22 U.S.C. § 6083(a). The Foreign Claims Settlement Commission's certification of a claim is "conclusive proof of ownership of an interest" in the property for purposes of suit under Title III. *Id.* § 6083(a)(1). For claims not certified by the Commission, a court may "appoint a special master … to make determinations regarding the amount and ownership of the claim." *Id.*

§ 6083(a)(2); *see id.* ("Such determinations are only for evidentiary purposes in civil actions brought under this subchapter ….").

Congress provided that liability for trafficking in covered property under the LIBERTAD Act would begin "after the end of the 3-month period beginning on the effective date" of Title III, 22 U.S.C. § 6082(a)(1)(A), which Congress designated as August 1, 1996, *id.* § 6085(a). But Congress authorized the President to suspend that effective date for six months "if the President determines … that the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." *Id.* § 6085(b)(1); *see id.* § 6085(b)(2) (authorizing suspension for additional six-month periods). Congress separately authorized "[t]he President [to] suspend the right to bring an action under this subchapter for … periods of not more than 6 months each," if the same conditions for suspending the statute's effective date are met. *Id.* § 6085(c)(2); *see id.* § 6085(c)(1) (authorizing initial six-month suspension).

When he signed the LIBERTAD Act into law, President Clinton "allow[ed] title III to come into force," leaving Congress's August 1, 1996 effective date unchanged. Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 2 Pub. Papers

1136, 1137 (July 16, 1996), https://go.usa.gov/xz5nn.  But President Clinton also exercised his authority to suspend the right to sue, explaining that, by suspending the right to sue but not the effective date, he was putting "all companies doing business in Cuba … on notice that by trafficking in expropriated American property, they face the prospect of lawsuits and significant liability in the United States." *Id.*

After that initial suspension, the Executive Branch continuously exercised its authority to suspend the right to sue under § 6085(c)(2) until 2019.  *See, e.g.*, Office of the Spokesperson, U.S. Dep't of State, *Secretary's Determination of Six Months' Suspension Under Title III of LIBERTAD Act* (June 28, 2018), https://perma.cc/6NFX-675Q; *see also Delegation of Authority To Suspend the Provisions of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996*, 78 Fed. Reg. 9573 (Feb. 8, 2013) (presidential delegation of suspension authority under § 6085(c)(2) to Secretary of State).  Effective May 2, 2019, Secretary of State Pompeo fully ended the suspension of the right to sue under Title III.  *See* Secretary of State Michael R. Pompeo, U.S. Dep't of State, *Remarks to the Press* (April 17, 2019), https://perma.cc/2JPQ-X4TG.

## II.    Procedural Background

Plaintiffs in these three cases assert ownership of claims concerning waterfront property in Cuba that was confiscated by the Cuban Government shortly after the 1959 revolution.  Plaintiffs sued defendants under Title III, alleging that they trafficked in that property within the meaning of the LIBERTAD Act.

**A.**    The property at the center of the two cases brought by Garcia-Bengochea was, before the revolution, owned by La Maritima S.A., a company in which Albert Parreño, a U.S. national, owned stock.  The Cuban Government nationalized La Maritima and confiscated its property in 1960.  In 1970, the Foreign Claims Settlement Commission certified Albert's claim based on the expropriation of La Maritima.  When Albert died, his claim passed to his brother, Desiderio Parreño, a Costa Rican national, under a will Albert executed in 1966.  Desiderio in turn bequeathed the claim to Garcia-Bengochea, a U.S. national, under a will Desiderio executed in 2000.  *See generally* Appendix 199-201, *Garcia-Bengochea v. Carnival Corp.*, No. 20-12960 (CC App.).[1]

---

[1] Citations to the *Carnival Corp.* appendix are to the page numbers generated by the ECF system.

Garcia-Bengochea separately sued Carnival Corporation and Royal Caribbean Cruises under Title III of the LIBERTAD Act.  He alleged that by using docks previously owned by La Maritima for their cruise line businesses, the companies had trafficked in confiscated property as to which he owns a claim.

**1.**  In the *Carnival* case, the company sought judgment on the pleadings arguing, as relevant here, that Garcia-Bengochea acquired any interest in the claim no earlier than 2000 and that he was therefore barred by the statutory limitation on claims applicable to property confiscated before the statute's enactment.  CC App. 200.

The district court agreed that Garcia-Bengochea's claim is barred and entered judgment for Carnival.  The court found undisputed that the original owner of the claim, Albert Parreño, bequeathed the claim to his brother, Desiderio Parreño.  CC App. 200-01 & 201 n.2.  It also found undisputed that Desiderio Parreño, a Costa Rican national, bequeathed the claim to Garcia-Bengochea after Congress enacted the statute.  CC App. 200-01 & 201 n.3.  Thus, the court found it undisputed that Garcia-Bengochea acquired his interest in the claim after the statutory cutoff.  *See* CC App. 205.

As noted, the statute precludes a United States national from bringing suit with respect to property confiscated before March 12, 1996, the date of statute's enactment, "unless such national acquires ownership of the claim before" that date.  22 U.S.C. § 6082(a)(4)(B).  Garcia-Bengochea argued that "the term 'acquires' involves an 'affirmative action to obtain the property,' but 'to inherit is to simply receive,' which is a 'passive concept.'"  CC App. 205 (quoting Garcia-Bengochea's filing).  Thus, according to Garcia-Bengochea, the term "'acquires' does not include 'inheritances' as a matter of statutory interpretation."  *Id.* (quoting Garcia-Bengochea's filing).

The district court rejected that argument.  First, the court concluded that "the plain meaning of the term 'acquire'" is "broad enough to cover the inheritance at issue in this case."  CC App. 205.  The court noted that Black's Law Dictionary defines "acquire" to mean "[t]o gain possession or control of; to get or obtain."  *Id.* (alteration in original) (quoting 11th ed. 2019).  And an earlier version of that dictionary states that the term "[i]ncludes taking by devise."  *Id.* (alteration in original) (quoting 6th ed. 1990).

Second, the district court held that a comparison of the provision at issue to the following one further supports the conclusion that Congress intended "acquire" in § 6082(a)(4)(B) to include "inherit":  The provision

9

addressing property Cuba confiscated after the date of the statute's enactment precludes claims by a United States national who "acquired their claim 'by assignment for value.'" CC App. 206 n.7 (quoting 22 U.S.C. § 6082(a)(4)(C)). The court observed that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (alteration in original) (quoting *In re Vann*, 67 F.3d 277, 281 (11th Cir. 1995)).

Third, the district court noted that the legislative history indicates that Congress intended the cutoff "to eliminate any incentive that might otherwise exist to transfer claims to confiscated property to U.S. nationals in order to take advantage of the remedy created by this section." CC App. 206 (quoting H.R. Rep. No. 104-468, at 59 (1996) (Conf. Rep.)). As a Costa Rican national, Desiderio Parreño could not bring suit under the statute. According to the district court, Garcia-Bengochea's suit "appears to be the very thing Congress intended to eliminate by adding § 6082(a)(4)(B) to the Act." *Id.*

For these reasons, the district court held that Garcia-Bengochea's claim was barred by the statutory limitation on the right of action, and it granted Carnival judgment on the pleadings. CC App. 206-07.

**2.** Applying its reasoning in the *Carnival* case to the "nearly identical" suit Garcia-Bengochea brought against Royal Caribbean, the Court also granted that defendant's motion for summary judgment. Appendix 91, 93, *Garcia-Bengochea v. Royal Caribbean*, No. 20-14251.

**B.** Plaintiffs in the *Del Valle* litigation claim to be the heirs to beach-front property in Cuba confiscated by the Cuban government after the revolution. Because they were not U.S. nationals at the time of the confiscation, they were not eligible to file claims before the Foreign Claims Settlement Commission. *See* Appendix 46, *Del Valle v. Trivago GMBH*, No. 20-12407 (DV App.); 22 U.S.C. § 1643c(a). Cuba erected a hotel and a resort on the properties. The Del Valle plaintiffs sued a number of online booking providers under Title III, alleging that they trafficked in the confiscated property by renting rooms at the hotel and resort on their websites. The district court dismissed the suit for failure to establish personal jurisdiction over defendants. *See generally* DV App. 388-91.

11

In their motions to dismiss, the *Del Valle* defendants argued in the alternative that plaintiffs failed to state a claim.  Among other things, defendants argued that plaintiffs failed to plead that defendants' bookings did not constitute transactions incident to lawful travel to Cuba and so had not adequately pled that defendants engaged in trafficking within the meaning of Title III.  DV App. 221-22, 248-49; *see* 22 U.S.C. § 6023(13)(B)(iii) (excluding from the definition of "[t]raffics" "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel").

Defendants further argued that even if lawful travel is an affirmative defense, dismissal for failure to state a claim would be appropriate because it is apparent on the face of the complaint that the companies' bookings qualify as transactions incident to lawful travel.  DV App. 222-23, 250-51. Defendants noted that the Treasury Department's Office of Foreign Assets Control (OFAC) has authorized certain travel to Cuba.  DV App. 222, 250 (both citing 31 C.F.R. § 515.560(a)).  And they claimed that they offered lodging to those lawfully travelling to Cuba under an OFAC general license. DV App. 222-23, 250 (both citing 31 C.F.R. § 515.572(a) ("Persons subject to

U.S. jurisdiction are authorized to provide travel services in connection with travel-related transactions involving Cuba authorized pursuant to this part.")).  Because the district court dismissed plaintiffs' suit for failure to establish personal jurisdiction, however, the court did not reach these arguments.

**C.**  On October 4, 2021, this Court held oral argument in the *Carnival Corp.*, *Royal Caribbean*, and *Del Valle* cases.  On December 20, 2021, the Court invited the United States to provide its views on six sets of questions related to the cases.  The United States submits this brief in response to that invitation.

## III.   Standard of Review

The questions posed by the Court involve legal issues, which the Court considers de novo.  *See, e.g.*, *Ramirez v. Statewide Harvesting & Hauling, LLC*, 997 F.3d 1356, 1359 (11th Cir. 2021) ("[The Court] review[s] legal questions *de novo*.").

## SUMMARY OF ARGUMENT

**I.A.**  22 U.S.C. § 6082(a)(4)(B) and (C) partially define the class of "United States national[s]" who may bring suit under Title III of the LIBERTAD Act.  As a matter of grammar and statutory structure, the

"United States national" referred to in 22 U.S.C. § 6082(a)(4)(B) and (C) is the plaintiff bringing suit.  Other provisions of the statute define different classes of "United States nationals," but there is nothing inconsistent about interpreting those provisions as identifying different classes of United States nationals for the different ends furthered by the provisions.

**B.**  Under its ordinary meaning, the undefined term "acquire[]" in 22 U.S.C. § 6082(a)(4)(B) includes inheritance.  The qualification in 22 U.S.C. § 6082(a)(4)(C) that a United States national may not bring suit related to property expropriated after March 12, 1996, if the person "acquires ownership of a claim to the property by assignment for value" demonstrates that Congress qualified the ordinary meaning of "acquire[]" when it intended to do so.  Because there is no federal law governing when a claim is acquired by an heir, state or foreign law determines the date on which a LIBERTAD plaintiff acquired his interest in the relevant property through inheritance.

**II.**  The President's statutory authority to suspend the effective date of Title III or the right of action does not affect the class of individuals who may bring suit under the LIBERTAD Act.  Congress gave the President suspension authority to afford the President flexibility to respond to unfolding developments in Cuba.  But nothing in the statute suggests that

14

the grant of the President's suspension authority alters the class of individuals who may sue or that the President's exercise of that authority expands the class beyond that specified by the statute.

**III.**  Travel to Cuba by persons subject to U.S. jurisdiction is highly restricted under federal law and is lawful only if the transactions related to such travel are authorized by OFAC's Cuban Assets Control Regulations. The Libertad Act's lawful travel exclusion implicitly points to that body of law.

The phrase "lawful travel to Cuba," 22 U.S.C. § 6023(13)(B)(iii), thus means travel that is permissible under OFAC regulations.  And "transactions and uses of property" are "incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel," *id.*, if the transactions and uses of property are "ordinarily incident to a licensed transaction" involving travel to Cuba "and necessary to give effect thereto," 31 C.F.R. § 515.421(a).

Transactions related to travel to Cuba are lawful only if they are authorized by OFAC regulations at the time of the transaction, so the possibility that OFAC may change its regulations does not affect the lawful travel exclusion in the LIBERTAD Act.

OFAC provides various resources to assist persons in determining the legality of activities involving travel to Cuba, including examples in its regulations, answers to frequently asked questions on the agency's website, and a telephone hotline.

The record in these cases is not sufficiently developed for the United States to opine on the application of the lawful travel exclusion to plaintiffs' claims.  However, it is not the burden of a plaintiff asserting claims under Title III to plead that transactions related to travel to Cuba were unlawful. The facts to establish that a transaction was incident to lawful travel to Cuba are uniquely in the possession of the person engaging in the transaction, and it is unlikely that any plaintiff could have a basis to allege that the conduct at issue did not fall within the lawful travel exclusion.  Accordingly, the better interpretation of the statute is that a plaintiff bringing suit under Title III does not have an obligation to plead that challenged activity does not come within the lawful travel exclusion.

## ARGUMENT

The United States here provides answers to the questions posed by the Court in its order of December 20, 2021.  The government takes no position

on issues not addressed in this brief, nor does it provide views on the

ultimate disposition of the three appeals.

## I.    The Meaning of "United States National" and "Acquire" and the Law Governing Property Acquired by Inheritance

The LIBERTAD Act provides that, "[e]xcept as otherwise provided in

this section, any person that … traffics in property which was confiscated by

the Cuban Government on or after January 1, 1959, shall be liable to any

United States national who owns the claim to such property."  22 U.S.C.

§ 6082(a)(1)(A).  The first three questions posed by the Court concern limits

on that right of action related to the date Cuba confiscated the property and

the date the United States national acquired ownership of the claim or the

manner in which the claim was acquired.  *See supra* p. 3.  The relevant

provisions state:

> (A) Except as otherwise provided in this paragraph, actions may be brought under paragraph (1) with respect to property confiscated before, on, or after March 12, 1996.

> (B) In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996.

> (C) In the case of property confiscated on or after March 12, 1996, a United States national who, after the property is confiscated, acquires ownership of a claim to the property by assignment for value, may not bring an action on the claim under this section.

17

22 U.S.C. § 6082(a)(4).

### A.   The Meaning of "United States national" in 22 U.S.C. § 6082(a)(4)(B) & (C)

**Question 1:** "Does the term 'United States national' in 22 U.S.C. §§ 6082(a)(4)(B) and 6082(a)(4)(C) refer to the plaintiff bringing the action, or the original claimant to the confiscated property, or both?"

\* \* \* \*

"United States national" is a statutorily defined term.[2]  Section 6082(a)(1)(A) specifies which class of United States nationals may sue under Title III:  "United States national[s] who own[ ] … claim[s]" to "property … confiscated by the Cuban Government on or after January 1, 1959."  22 U.S.C. § 6082(a)(1)(A).  Section 6082(a)(4) imposes limits on the right of action and so further defines the class of "United States national[s]" who may sue under Title III.  "[A] United States national may not bring an

---

[2] The LIBERTAD Act defines "United States national" to mean

(A) any United States citizen; or

(B) any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States.

22 U.S.C. § 6023(15).

action" concerning property confiscated before March 12, 1996, "unless such national acquires ownership of the claim" before that date. *Id.* § 6082(a)(4)(B). In the case of property expropriated on or after March 12, 1996, "a United States national … may not bring an action" if the national "acquires ownership of [the] claim to the property by assignment for value" after the property was confiscated. *Id.* § 6082(a)(4)(C).

The grammar of these provisions and their reference to the right of action make plain that the "United States national" identified in § 6082(a)(4)(B) and (C) is the person who would "bring" suit under the statute. Section 6082(a)(4)(B) states that it is "such national," *i.e.*, the "United States national," who may not "bring an action," unless she "acquires ownership of the claim before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B). And § 6082(a)(4)(C) precludes any "United States national" from "bring[ing] an action" if she acquired the relevant property "by assignment for value." These provisions thus clearly identify the "United States national" as the plaintiff bringing suit under Title III. That is not surprising because the purpose of § 6082(a)(4)(B) and (C) is to further define the class of individuals who may bring suit under the right of action created in § 6082(a)(1)(A).

19

Other provisions of Title III identify different classes of "United States national[s]." But the different classes of "United States national[s]" identified in other contexts do not require an interpretation of § 6082(a)(4) that would conflict with that section's clear grammar and context.

For example, another provision of Title III states that a "United States national who was eligible to file a claim with the Foreign Claims Settlement Commission" but did not "may not bring an action on that claim under this section." 22 U.S.C. § 6082(a)(5)(A). The next subparagraph requires courts to accept as conclusive Commission decisions denying the claims of "United States national[s]." *Id*. § 6082(a)(5)(B). These provisions identify United States nationals who did file or could have filed claims with the Commission. But those provisions identify classes of United States nationals for purposes different from those of § 6082(a)(4). Section 6082(a)(4)(B) and (C) set limits on the right of action based on the date of Cuba's expropriation and the date or manner of the United States national's acquisition of the claim to the confiscated property. Section 6082(a)(5) sets limits based on a United States national's failure to file a claim with the Commission or her receipt of an adverse decision from that body. Nothing about the phrase "United States

national" requires these various provisions to identify the same class for their different purposes.

Yet another provision employing the term "United States national" imposes a different limit on suits involving certified claims. Section 6082(a)(5)(D) states that "[a]n interest in property for which a United States national has a claim" that was certified by the Foreign Claims Settlement Commission may not be the subject of a LIBERTAD Act suit "by any other person." 22 U.S.C. § 6082(a)(5)(D). The purpose of this provision is to limit suits under Title III involving claims certified by the Commission to the person who "has" the claim, which may be the person who filed the claim in the Commission or a subsequent owner of the claim. Nothing in this provision calls into question § 6084(a)(4)'s definition of the class of "United States national[s]" who may bring suit based on other considerations.

There is nothing inconsistent about interpreting these provisions as identifying distinct classes of United States nationals for the different ends furthered by the provisions. Nor do dissimilar interpretations violate the canon that, "'[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning' across a statute." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020) (quoting *Cochise Consultancy,*

*Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019)).  The phrase "United States national" has the same meaning throughout the LIBERTAD Act.  *See* 22 U.S.C. § 6023(15).  Other words in the provisions identify different classes of United States nationals for the distinct purposes of those provisions.

For these reasons, "United States national" in § 6082(a)(4)(B) and (C) is best interpreted to refer to the plaintiff who "bring[s]" suit, regardless of whether that person is someone from whom Cuba expropriated property, someone whose claim was certified by the Foreign Claims Settlement Commission, or someone else who owns a claim to property expropriated by Cuba.[3]

---

[3] Section 6082(a)(4) does not limit the class of United States nationals who may rely on Title III's right of action to those who were the direct victims of Cuba's confiscation or those with certified claims.  Section 6082(a)(4)'s restrictions turn on the date of Cuba's expropriation and the date or manner of the United States national's acquisition of the claim.  Thus, for example, § 6082(a)(4)(B) would not preclude suit by a United States national who obtained a certified claim in 1971 concerning Cuba's expropriation in 1960 of property belonging to their ancestor, who also was a United States national.  *See, e.g., Costa*, Claim No. CU-3344, Decision No. CU-6016 (F.C.S.C. 1971) (Proposed Decision), https://go.usa.gov/xznZf; *see FCSC Cuba Report* 178 n.* (noting that Proposed Decision became Final Decision).  That certified claim would be "conclusive proof of ownership of an interest in property."  22 U.S.C. § 6083(a)(1).  And Title III's authorization for the use of a special master to make determinations concerning ownership and value of

**B.** **The Meaning of "Acquires" in 22 U.S.C. § 6082(a)(4)(B), the Import of "Assignment for Value" in 22 U.S.C. § 6082(a)(4)(C), and the Law Governing Inheritance**

**Question 2:** "What does the word 'acquire[]' in 22 U.S.C. § 6082(a)(4)(B) mean?  Is inheritance encompassed in the term 'acquire[]?'  And if 'acquire[]' does include inheritance, at what point is a claim 'acquire[d]' by an heir within the meaning of the statute?"

**Question 3:** "How, if at all, does the phrase 'assignment for value' in 22 U.S.C. § 6082(a)(4)(C) affect the pool of eligible claimants compared to the pool of eligible claimants under 22 U.S.C. § 6082(a)(4)(B)?"

\* \* \* \*

**1.** The LIBERTAD Act provides that, in the case of property confiscated before March 12, 1996, a United States national "may not bring an action … unless such national acquires ownership of the claim before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B).  Because the statute does not define the term "acquires," the Court "interpret[s that] word[] in accordance with [its] plain and ordinary meaning." *Spencer v. Specialty Foundry Prods.*

---

uncertified claims establishes that Congress did not intend to make filing in the Foreign Claims Settlement Commission a prerequisite to every suit under the LIBERTAD Act. *Id.* § 6083(a)(2); *but see id.* § 6082(a)(5)(A) (precluding suit by United States nationals who could have filed claims with the Commission but did not do so).

*Inc.*, 953 F.3d 735, 740 (11th Cir. 2020).  And "[t]o determine the ordinary meaning of an undefined statutory term, [the Court] often look[s] to dictionary definitions"—"both popular and legal"—"for guidance."  *Id.* (quotation marks omitted).

At the time the statute was enacted, one prominent dictionary defined "acquire" as "[t]o gain, obtain, or get as one's own, to gain the ownership of (by one's own exertions or qualities)" or "[t]o receive, or get as one's own (without reference to the manner), to come into possession of."  *Acquire*, Oxford English Dictionary (2d ed. 1989) (definitions 1.a. and 2).  A contemporary prominent legal dictionary defined the term as "[t]o gain by any means, usually by one's own exertions; to get as one's own; to obtain by search, endeavor, investment, practice, or purchase; receive or gain in whatever manner; come to have."  *Acquire*, Black's Law Dictionary (6th ed. 1990).  Those dictionaries defined "inherit" as "[t]o take or receive (property, *esp.* real property, or a right, privilege, rank, or title) as the heir of the former possessor (usually an ancestor), at his decease; to get, or come into possession of, by legal descent or succession," *Inherit*, Oxford English Dictionary (2d ed. 1989) (definition 2), and "[t]o take or receive by inheritance; to take by descent as a matter of law as heir on death of

24

ancestor; though this item has also come to mean to receive by devise (*i.e.*, by will)," *Inherit*, Black's Law Dictionary (6th ed. 1990).

So understood, one may "acquire" something by "inheriting" it. To "receive … property … as [an] heir" is "to come into possession of" that property. *Inherit*, Oxford English Dictionary (definition 2); *Acquire*, *id.* (definition 2). Or, in other terms, to "receive" something "by inheritance" is to "come to have" that thing. *Inherit*, Black's Law Dictionary; *Acquire*, *id.* Both dictionaries contain more restrictive definitions of the term "acquire" that might not encompass "inheritance." *See Acquire*, Oxford English Dictionary (definitions 1.a) ("to gain the ownership of (by one's own exertions or qualities)"); *Acquire*, Black's Law Dictionary ("[t]o gain by any means, usually by one's own exertions"). But nothing in the statute suggests that Congress intended to limit the ordinary usage of "acquire[]," which includes acquisition by inheritance.[4]

---

[4] Notably, if the term "acquire[]" in § 6082(a)(4)(B) does not include acquisitions by inheritance, and if, as we have argued, "United States national" in the same provision refers to the person bringing suit, then no person who inherits a claim to property confiscated by Cuba before March 12, 1996 would be able to assert a claim under Title III because the statute provides that a United States national "may not bring an action … *unless* such national *acquires* ownership of the claim before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B) (emphases added).

**2.**  In § 6082(a)(4)(C), Congress made the Title III right of action

unavailable to those with claims concerning property Cuba confiscated after

March 12, 1996, if a person "acquires ownership of a claim to the property by

assignment for value."  22 U.S.C. § 6082(a)(4)(C).  That provision

demonstrates that when Congress intended to limit the types of acquisition

that could be the basis for a suit under the LIBERTAD Act, it did so

expressly.  There is no similar limitation of the term "acquires" in

§ 6082(a)(4)(B), the provision addressing property confiscated before the

date of the statute's enactment, and so no reason to think that Congress

intended to limit the ordinary meaning of the term in that provision.  *Cf.*

*Jama v. Immigration & Customs Enf.*, 543 U.S. 335, 341 (2005) ("We do not

lightly assume that Congress has omitted from its adopted text requirements

that it nonetheless intends to apply, and our reluctance is even greater when

Congress has shown elsewhere in the same statute that it knows how to

make such a requirement manifest.").

Because there is no indication that Congress intended the term

"acquires" to carry anything other than its ordinary meaning in

§ 6082(a)(4)(B), a United States national who acquires by inheritance a claim

to property confiscated by Cuba before March 12, 1996 may bring an action

26

under Title III only if the person inherited the claim prior to that date.
*Accord Glen v. American Airlines, Inc.*, 7 F.4th 331, 336 (5th Cir. 2021); *see also Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. 2021) (per curiam).

**3.** The LIBERTAD Act identifies claims to certain property that may be the basis for a suit under Title III. As relevant here, the statute makes actionable benefiting from certain commercial transactions in property expropriated by Cuba after 1959 but before March 12, 1996 without the permission of a United States national who acquired a claim to the property before that date. 22 U.S.C. § 6082(a)(1)(A), (4)(B). But the statute does not address how one comes to acquire an interest in such property, nor is there any generally applicable federal law governing such matters. Accordingly, courts should look to state law (or foreign law, when applicable) to determine when a plaintiff acquired, by inheritance or otherwise, a claim to property at issue in an action under Title III. *See Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."). After a court determines as a matter of state or foreign law when a plaintiff acquired ownership of a claim to property confiscated by Cuba, the court would look to the

27

LIBERTAD Act to determine whether the other requirements for suit are satisfied. *Cf., e.g.*, *Old W. Annuity & Life Ins. Co. v. Apollo Grp.*, 605 F.3d 856, 861 (11th Cir. 2010) (per curiam) (engaging in an analogous "two-part analysis to determine whether a federal tax lien could attach to an inheritance that had been disclaimed by the taxpayer under state law").

## II.    The Effect of the President's Suspension Authority

**Question 4:** "What effect, if any, does the President's ability to suspend Title III pursuant to 22 U.S.C. § 6085(b) have on defining the class of eligible claimants who can bring an action under 22 U.S.C. § 6082(a)(4)? Does the President's ability to suspend Title III imply that the statute was drafted to allow the heirs of American citizens—whose property was unlawfully confiscated and 'trafficked' by third parties—to bring claims under 22 U.S.C. § 6082(a)(4)?"

* * * *

As noted above, Congress gave the President two different suspension authorities:  the authority to suspend the effective date of Title III and the authority to suspend the right of action, in both cases after making certain determinations. *See supra* p. 5.  President Clinton allowed Title III to go into effect, but he suspended the right of action, and the Executive Branch

28

extended that suspension every six months until Secretary of State Pompeo declined to further extend it in 2019. *See supra* pp. 5-6.

Nothing in the text of the statute or the legislative history suggests that Congress intended the President's suspension authority to alter the substantive provisions of the statute or to expand the scope of the provisions defining the class of United States nationals who may sue under Title III. By their terms, the suspension provisions do nothing more than authorize the President to "suspend the effective date" of Title III or "suspend the right to bring an action" pursuant to the statute. *See, e.g.*, 22 U.S.C. § 6085(b)(1), (c)(1)(B). They do not expressly expand the category of plaintiffs who are eligible to bring suit under § 6082(a)(1) in the event of the President's exercise of the suspension authority. And nothing in the statute suggests that the President's possible suspension of Title III's effective date or the right to sue would expand the class of plaintiffs who may rely on the statutory right of action, when it is effective, beyond the class specified by the statute. Rather, the House conference report explains that it added the suspension authority "at the request of the Executive branch in order to afford the President flexibility to respond to unfolding developments in Cuba." H.R. Rep. 104-468, at 65.

### III.   The "Incident to Lawful Travel" Exclusion

**Question 5:**  "What effect, if any, does the lawful travel exception, 22 U.S.C. § 6023(13)(B)(iii), have on the plaintiffs' claims?  What effect, if any, does the possibility that the Office of Foreign Assets Control (OFAC) can change the permissible reasons for travel to Cuba have on the lawful travel exception?"

**Question 6:**  "What does the phrase 'incident to lawful travel' in 22 U.S.C. § 6023(13)(B)(iii) mean?  Who or what defines 'lawful travel' (e.g. OFAC)?  What guidance should persons and entities look to in determining whether their activities are 'incident to lawful travel?'"

* * * *

The LIBERTAD Act excludes from the definition of "traffics" "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel."  22 U.S.C. § 6023(13)(B)(iii) (lawful travel exclusion or LIBERTAD Act exclusion).  As explained below, the application of the lawful travel exclusion is underdeveloped in the records of these cases.  *See infra* pp. 36-37.  But the United States provides the following views for the Court's consideration, to the extent the issues are before the Court.

Travel to Cuba by persons subject to U.S. jurisdiction is highly restricted under federal law and is lawful only if the transactions related to such travel are authorized by OFAC under the Cuban Assets Control Regulations. *See* 31 C.F.R. pt. 515. That background legal framework regulating lawful travel to Cuba informs the meaning of the LIBERTAD Act exclusion.

**A.** Pursuant to various statutes and executive orders, most economic transactions with Cuba by persons subject to U.S. jurisdiction and transactions involving Cuban property subject to U.S. jurisdiction are prohibited. 31 C.F.R. § 515.201; *see Reporting and Procedures Regulations: Consolidation of Information Collections*, 62 Fed. Reg. 45,098, 45,016 (Aug. 25, 1997) (identifying statues and executive orders authorizing the Cuban Assets Control Regulations); *see also* 15 C.F.R. § 746.2 (regulating exports to Cuba). Among the prohibited transactions are transactions related to travel to Cuba. Congress has expressly proscribed travel to Cuba for tourism. 22 U.S.C. § 7209(b). And those who wish to travel lawfully to Cuba for other purposes generally must do so pursuant to licenses issued by OFAC authorizing the travel-related transactions. *See* 31 C.F.R. § 515.201.

As a general matter, OFAC authorizes transactions it regulates through "general" or "specific" licenses. A "general license" sets out a type or category of authorized transaction in the regulation, and a person may lawfully engage in that activity without individual authorization from OFAC. *See* 31 C.F.R. § 501.801(a). All other transactions that are otherwise prohibited are lawful only if the person wishing to engage in the activity obtains a "specific license" from the agency. *See id.* § 501.801(b).

OFAC has issued a general license authorizing certain transactions related to travel to Cuba for twelve types of activities. 31 C.F.R. § 515.560(a), (c) and provisions cited therein; *see, e.g., id.* § 515.565 (general license for educational activities, including travel-related transactions incident thereto). In January 2015, OFAC also issued a general license authorizing "travel services in connection with [authorized] travel-related transactions involving Cuba." *Id.* § 515.572(a)(1). Under OFAC's regulations, "[a]ny transaction ordinarily incident to a licensed transaction and necessary to give effect thereto is also authorized." *Id.* § 515.421(a). Thus, persons engaging in transactions authorized by these general licenses and transactions ordinarily incident to those transactions and necessary to

give them effect need not obtain specific permission from OFAC for their activity.[5] *Id.* § 501.801(a).

**B.** When Congress enacted the LIBERTAD Act, as now, the Cuban Assets Control Regulations prohibited most travel-related transactions concerning Cuba by persons subject to U.S. jurisdiction. *See* 31 C.F.R. §§ 515.201, 515.560 (1995). Although the LIBERTAD Act's lawful travel exclusion does not explicitly cross-reference the Cuban Assets Control Regulations, in light of the highly restricted nature of travel to Cuba, the statute implicitly invokes that regulatory regime through its reference to "lawful travel" to Cuba. *See United States v. Quality Stores, Inc.*, 572 U.S. 141, 151 (2014) (explaining that a statute should be interpreted in light of the "regulatory background against which [it] was enacted"). Relying on that well-established regulatory regime ensures that potentially sensitive foreign policy questions regarding the lawfulness of travel to Cuba are decided by the political branches. *Cf. Regan v. Wald*, 468 U.S. 222, 242 (1984) (referencing the "classical deference to the political branches in matters of foreign policy").

---

[5] As of October 28, 2000, OFAC no longer issues specific licenses for travel-related transactions involving Cuba that are not authorized by the general licenses. 31 C.F.R. § 515.560(b).

33

Accordingly, as used in the LIBERTAD Act exclusion, the phrase "lawful travel to Cuba," 22 U.S.C. § 6023(13)(B)(iii), means travel for which transactions are authorized under the Cuban Assets Control Regulations.[6] And "transactions and uses of property" are "incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel," *id.* § 6023(13)(B)(iii), if the transactions and uses of property are "ordinarily incident to a licensed transaction" involving travel to Cuba "and necessary to give effect thereto," 31 C.F.R. § 515.421(a).

Travel to Cuba is lawful only if, at the time of the travel, the travel-related transactions were authorized by an OFAC license. A completed licensed transaction does not become unlawful because OFAC later changes the authorized travel-related transactions. Because the lawful travel exclusion implicitly points to the travel-related Cuban Assets Control Regulations, the exclusion focuses on the legality of travel-related transactions at the time of the alleged trafficking. Accordingly, the possibility that OFAC in the future might change the activities for which

---

[6] In some circumstances, other regulatory regimes may inform the meaning of "lawful travel to Cuba." For example, the vessels and aircraft used for travel to Cuba may be regulated by the Export Administration Regulations promulgated by the Bureau of Industry and Security in the Commerce Department. *See* 15 C.F.R. § 746.2.

travel-related transactions are authorized has no bearing on the application of the lawful travel exclusion.

**C.**  OFAC provides a variety of resources to assist the public in determining whether a transaction would be incident to lawful travel to Cuba within the meaning of the Cuban Assets Control Regulations and so within the meaning of the LIBERTAD Act's lawful travel exclusion.

At the most general level, OFAC regulations provide two examples of transactions that are "incident to a licensed transaction and necessary to give effect thereto," 31 C.F.R. § 515.421(a).  *See id.* § 515.421(b) (explaining that "activities that are ordinarily incident and necessary to complete [a securities] sale, including transactions by the buyer, broker, transfer agents, and banks" are incident to a sale of securities and that "funds transfers or payments that are ordinarily incident to … importation, including payments made using online payment platforms" are incident to the importation of goods).  Although those examples do not involve travel, they help demonstrate the type of relationship between the incidental transaction and the licensed transaction that OFAC has authorized.

OFAC's website provides more detailed information about the types of transactions related to travel to Cuba that OFAC has authorized, including

information to assist persons seeking to determine whether some activity is "incident to lawful travel" within the meaning of the LIBERTAD Act exclusion. For example, OFAC's website has a Frequently Asked Questions page that addresses variety of topics, including "Cuba Sanctions." *See* OFAC, *Frequently Asked Questions*, https://go.usa.gov/xzP92 (last visited Apr. 10, 2022). Many of the questions and answers address transactions incident to lawful travel to Cuba. *See, e.g.*, OFAC, *Frequently Asked Questions, Cuba Sanctions, No. 712*, https://go.usa.gov/xzPX8 (last updated Nov. 8, 2017) (stating that a person may "purchase a ticket to Cuba directly from an airline based or operating out of the United States" if the person is "authorized to travel to Cuba pursuant to an OFAC general or specific license"). OFAC also provides a telephone "hotline" that the public may call to request guidance about whether a particular transaction is permissible. OFAC, *Contact OFAC*, https://go.usa.gov/xtznW (last visited Apr. 10, 2022).

**D.** The Court asked for the United States' views on the effect of the lawful travel exclusion on the plaintiffs' claims. Because none of the district court decisions applied the lawful travel exclusion, and because the issue is generally underdeveloped in the record, the United States does not take a position on whether or how the exclusion might apply to the facts of these

cases.  But the United States does note that, in its view, a plaintiff does not bear the burden to plead specific allegations that would establish that the defendant's travel-related transactions were not "incident to lawful travel."

Since January 2015, a party undertaking travel-related transactions on behalf of another who is lawfully travelling to Cuba "must retain for at least five years from the date of the transaction a certification from each customer indicating the section of [the Cuban Assets Control Regulations] that authorizes the person to travel."  31 C.F.R. § 515.572(b)(1) (transactions pursuant to general license); *see id.* (same requirement for transactions pursuant to specific licenses).  Thus, whether a LIBERTAD Act defendant's transactions were incident to lawful travel to Cuba involves facts that are uniquely in the defendant's possession.  Because most travel to Cuba is restricted and travel-related transactions are lawful only if they are authorized under narrow licenses authorized by OFAC, the same is also true of travel-related transactions that pre-date the 2015 record-keeping requirement.

Whether the lawful-travel exception is best conceived as a denial of plaintiffs' allegations under Federal Rule of Civil Procedure 8(b) or an affirmative defense under Rule 8(c)—an issue on which the government

takes no position—it is unlikely that a plaintiff would have sufficient knowledge to allege in good faith, even on "information and belief," that the defendant's transaction was not incident to lawful travel.  It is unlikely that Congress intended to so limit the right of action.  Accordingly, the better interpretation of the statute is that a plaintiff bringing travel-related claims under Title III does not have an obligation to plead that challenged activity does not come within the lawful travel exclusion.  That construction is further supported by "the familiar principle that '[w]hen a proviso … carves an exception out of the body of a statute or contract those who set up such exception must prove it.'"  *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008) (alteration in original) (quoting *Javierre v. Central Altagracia*, 217 U.S. 502, 508 (1910)); *see also, e.g.*, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("[T]he burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or exemptions."); *Federal Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948) (noting "the general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits").

## CONCLUSION

For the foregoing reasons, the Court should adopt the analysis

provided in this brief to the extent it reaches the issues addressed above.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

JUAN ANTONIO GONZALEZ
  *United States Attorney*

SHARON SWINGLE

*s/Lewis S. Yelin*
LEWIS S. YELIN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7239*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3425*

April 2022

## CERTIFICATE OF COMPLIANCE

This brief contains 7,955 words.  Concurrent with the filing of this

brief, the United States has filed a motion for leave to exceed the word limit

prescribed by Federal Rule of Appellate Procedure 29(a)(5).  This brief

complies with the typeface and type-style requirements of Federal Rule of

Appellate Procedure 32(a)(5)-(6) because it was prepared with CenturyExpd

BT 14-point, a proportionally spaced font.

                            *s/ Lewis S. Yelin*
                            Counsel for the United States


## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2022, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the Eleventh Circuit by using the appellate CM/ECF system,

which constitutes service on all parties under the Court's rules.

                            *s/ Lewis S. Yelin*
                            Counsel for the United States